******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# EDITH R. JEMIOLA, TRUSTEE OF THE EDITH R. JEMIOLA LIVING TRUST *v.* HARTFORD CASUALTY INSURANCE COMPANY
## (SC 19978)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff, whose home had been insured by the defendant insurance
company since 1986, sought to recover damages from the defendant
for, inter alia, its alleged breach of a homeowners insurance policy that
it had issued to the plaintiff. Before March, 2005, the homeowners
insurance policies issued to the plaintiff covered the collapse of the
home resulting from one of several specified causes but did not define
the term "collapse." Since March, 2005, however, all of the policies
issued to the plaintiff have defined the term "collapse" to mean "an
abrupt falling down or caving in of a building or any part" such that
"the building or part of the building cannot be occupied for its current
intended purpose." The defendant first noticed cracks in the basement
walls in 2006 but did not report them to the defendant at that time. In
2014, she noticed more cracks in the basement walls and was informed
by a contractor she consulted that the cracks posed a serious problem
because it appeared that her foundation was likely constructed with
defective concrete. The plaintiff then submitted a claim to the defendant,
seeking coverage for her alleged loss. The defendant denied coverage,
claiming that the cracks were due to faulty workmanship and the type
of materials used to construct the walls, and that faulty workmanship,
materials, and the settling of walls and foundations were excluded from
coverage under the provision of the policy insuring against collapse.
The defendant also claimed that an engineer who inspected the walls
had determined that their structural integrity was not compromised.
The trial court granted the defendant's motion for summary judgment
and rendered judgment thereon, concluding, inter alia, that the provision
of the applicable policy pertaining to coverage for collapse required an
actual falling down or caving in of the home so as to render it uninhabi-
table, that it was undisputed that such an actual collapse had not
occurred, and that the loss alleged by the plaintiff, therefore, was not
covered under that policy. On the plaintiff's appeal, *held*:

1. The plaintiff could not prevail on her claim that the trial court incorrectly
concluded that only the homeowners insurance policies issued to the
plaintiff by the defendant since March, 2005, were applicable to her claim
for coverage; the plaintiff's expert opined that the structural integrity
of the basement walls could not have become substantially impaired
until there was some outward manifestation of cracking or fracturing,
the plaintiff testified during her deposition that she first noticed cracking
in the basement concrete in 2006, and, accordingly, there was no genuine
issue of material fact as to whether the structural integrity of the plain-
tiff's basement walls was substantially impaired when the policies issued
before March, 2005, were in effect.

2. The trial court correctly concluded that the collapse provision of the
applicable homeowners insurance policy unambiguously excluded cov-
erage for the cracking in the plaintiff's basement walls: at the time of
the plaintiff's claim for coverage, the house had not suffered an abrupt
falling down or caving in, complete or partial, such that it could not be
occupied for its intended purpose, as the plaintiff's house was still
standing, the plaintiff continued to reside there, the plaintiff's expert
opined that she could continue to reside there safely for the foreseeable
future, and the plaintiff continued to use her basement for recreational
and storage purposes; moreover, even if the plaintiff's basement walls
were in imminent danger of falling down, which this court concluded
was not the case, her claim would have been barred by the provision
in the policy clarifying that a collapse has not occurred when, although
there is evidence of cracking, the building is still standing; furthermore,

even if this court agreed with the plaintiff that the definition of "collapse" contained in the applicable policy was ambiguous and, therefore, that the substantial impairment of structural integrity standard adopted by this court in *Beach* v. *Middlesex Mutual Assurance Co.* (205 Conn. 246) applied for the purpose of determining coverage, this court would have been compelled to affirm the trial court's judgment in light of its decision in *Karas* v. *Liberty Ins. Corp.* (335 Conn. 62), in which the court concluded that a substantial impairment of the structural integrity of a building means that the building is in imminent danger of falling down and is therefore unsafe to occupy, as it was undisputed that the plaintiff's home was in no such danger.

Argued December 18, 2018—officially released November 12, 2019*

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the trial court, *Cobb, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Jeffrey R. Lindequist*, for the appellant (plaintiff).

*Thomas O. Farrish*, with whom were *Daniel J. Raccuia* and, on the brief, *John W. Cerreta*, for the appellee (defendant).

*Ryan M. Suerth*, *Marilyn B. Fagelson* and *Proloy K. Das* filed a brief for United Policyholders as amicus curiae.

*Wystan M. Ackerman* filed a brief for the American Insurance Association et al. as amici curiae.

*Opinion*

PALMER, J. The plaintiff, Edith R. Jemiola, commenced this action against the defendant, Hartford Casualty Insurance Company, claiming that the defendant breached the homeowners insurance policy that it had issued to the plaintiff by denying coverage for cracks in her home's basement walls under the collapse provisions of the policy.[1] After determining that the evidence conclusively established which of several homeowners insurance policies that the plaintiff had purchased from the defendant over the years was applicable at the time the plaintiff sustained the alleged loss, the trial court granted the defendant's motion for summary judgment because that policy defines "collapse" as "an abrupt falling down or caving in" of the home such that it "cannot be occupied for its current intended purpose," and there is no dispute, first, that the plaintiff's home remains standing and is in no imminent danger of falling down, and, second, that the plaintiff continues to occupy the home as her primary residence. On appeal, the plaintiff claims that the trial court improperly granted the defendant's motion for summary judgment both with respect to the applicable policy and with respect to the issue of coverage. In particular, she contends that (1) the policy the trial court found to be applicable is not, in fact, the applicable policy, (2) she is entitled to the opportunity to prove to a jury that the applicable policy is, instead, an earlier one issued by the defendant to the plaintiff that does not define the term "collapse," (3) when undefined in a homeowners insurance policy, that term, under our holding in *Beach* v. *Middlesex Mutual Assurance Co.*, 205 Conn. 246, 532 A.2d 1297 (1987), "is sufficiently ambiguous to include coverage for any substantial impairment of the [home's] structural integrity"; id., 252; and (4) a jury reasonably could find that the plaintiff's evidence meets that standard. The plaintiff also maintains that, even if the applicable policy is one that defines the term "collapse" as requiring an actual falling down or caving in of the home, the term nevertheless is ambiguous, and, consequently, the substantial impairment of structural integrity standard that we adopted in *Beach* still applies. We agree with the trial court's determination regarding the applicable policy and further agree that the collapse provisions of that policy unambiguously foreclose coverage under the circumstances of the present case. Accordingly, we affirm the trial court's judgment.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The plaintiff's home, which she purchased in 1986 and where she currently resides, is located in the town of Willington.[2] It has been insured continuously by the defendant since 1986. Until March, 2005, the plaintiff's policies covered the collapse of the home resulting from

one of several specified causes, but none of those policies defined the term "collapse." Since March, 2005, however, all of the homeowners' policies issued by the defendant to the plaintiff have defined the term narrowly to mean "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." Coverage for the home's collapse under the policies issued since March, 2005, is further limited by the following three provisions: (1) "[a] building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse"; (2) "[a] part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building"; and (3) "[a] building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion."

In the late 1990s, the plaintiff observed a crack in the drywall in her master bedroom, which she repaired by painting over it. In addition, sometime between 2005 and 2006, she noticed that several nails in her kitchen walls had popped out of the walls, and, in 2009 and 2010, she saw that more nails had been displaced from around the windows in other areas of her home. She first noticed cracks in her basement walls in 2006 but did not report them to the defendant because the contractor she hired to repair them told her that they were normal. In 2014, the plaintiff noticed more cracking in the same area of the basement that had been repaired in 2006. On this occasion, the contractor she consulted informed her that the cracks posed a very serious problem because it appeared that her foundation, like the foundations of thousands of other homes in Connecticut, was likely constructed with defective concrete manufactured by the J.J. Mottes Concrete Company (Mottes).[3] Upon receiving this information, the plaintiff immediately submitted a claim to the defendant, which sent an engineer to her home to inspect the foundation. Following the inspection, the defendant denied the claim, stating in the denial letter that its engineer had determined that "the foundation was cracking due [to] faulty workmanship and the type of materials used in the foundation," and that, "[u]nfortunately, faulty workmanship and materials as well as settling of walls and foundations are excluded from coverage under the policy." The letter further stated, moreover, that the defendant's engineer had also determined that "the structural integrity of the foundation walls is not compromised."

Following receipt of the denial letter, the plaintiff commenced the present action, claiming that the defendant had breached the collapse provisions of her policy by declining to cover her alleged loss.[4] The plaintiff maintained that the loss occurred prior to March, 2005,

and, therefore, that one of the policies issued prior to March, 2005, applied to her claim. The plaintiff further maintained that, because none of those policies defines the term "collapse," the court was required to apply the common-law definition of the term, as adopted by this court in *Beach*, pursuant to which the plaintiff need only establish that the structural integrity of her basement walls are substantially impaired.[5] Finally, the plaintiff argued that, even if it is determined that her alleged loss occurred after March, 2005, such that the applicable policy is one that purports to define the term "collapse" narrowly, that definitional language is itself ambiguous, and, consequently, the definition of the term that we adopted in *Beach* also applies to any such policy.

As factual support for her claim of coverage, the plaintiff adduced the deposition testimony of David Grandpre, a structural engineer who has testified in numerous cases involving Mottes concrete. In his deposition, Grandpre opined that the cracking in the plaintiff's basement walls is the result of chemical reactions occurring within the concrete that causes the concrete to expand. This expansion, Grandpre explained, has substantially impaired the walls' structural integrity and will continue to do so until the walls no longer can support the weight of the house, at which point the house will collapse. Grandpre could offer no opinion as to when such a collapse might occur. He did opine, however, that, although the foundation was "doomed" from the start due to the defective concrete, its structural integrity did not become substantially impaired until there was some outward manifestation of cracking and fracturing in the basement walls, which the plaintiff first observed in 2006.

As legal support for her contention that the defendant's denial of coverage constituted a breach of the policy's collapse provisions, the plaintiff relied on *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 246, a case involving a homeowners insurance policy that, like the policy in the present case, also covered certain losses resulting from a collapse of the home. See id., 250. The policy at issue in *Beach* contained no definition of the term "collapse"; see id., 250–51; and, consequently, we were required to decide whether, as the insurer claimed, the term plainly connotes a "sudden and complete catastrophe"; id., 250; resulting in an "actual [caving in]" rendering the home "completely uninhabitable"; id., 253; or whether, as the homeowners contended, the term was sufficiently ambiguous to encompass a "breakdown or loss of structural strength"; id., 251; such that the home's structural integrity was substantially impaired. See id., 252. We agreed with the homeowners' contention that the term "collapse," when otherwise undefined, is reasonably susceptible of both meanings; see id., 250–51; and, further, that the term must be understood in accordance

with the more expansive definition advanced by the homeowners because, under established rules of construction, any ambiguity in the language of an insurance policy is to be resolved against the insurer as the party that drafted the policy. Id., 250; see id., 251–52.

In the present case, the defendant disputed the plaintiff's contentions and filed a motion for summary judgment, maintaining, first, that no policy issued prior to March, 2005, applied to the plaintiff's claim of coverage because the uncontroverted evidence established that the plaintiff's alleged loss did not occur until 2006, when the plaintiff first noticed cracks in her home's basement walls. The defendant further asserted that, because the policies issued after March, 2005, all define the term "collapse" as requiring an actual falling down or caving in of the home, so as to render it uninhabitable, and it is undisputed that such an actual collapse has not occurred in this case, the loss alleged by the plaintiff is not covered under the policy. The trial court agreed with both contentions and, accordingly, granted the defendant's motion for summary judgment. In regard to its determination regarding the collapse provisions of the plaintiff's policy, the trial court observed that every court that has interpreted the language in question in the context of similar facts has concluded that the policy unambiguously forecloses coverage under those facts. On appeal,[6] the plaintiff renews the claims she raised in the trial court. We conclude that the trial court properly granted the defendant's motion for summary judgment.[7]

We first address the plaintiff's contention that the trial court incorrectly determined that the policies issued after March, 2005, are applicable to her claim. Specifically, the plaintiff argues that the trial court incorrectly concluded that the defendant had met its burden of establishing the absence of a genuine issue of material fact as to whether the structural integrity of the plaintiff's basement walls was substantially impaired prior to 2005. We disagree.

There is no debate that, for the policies issued prior to March, 2005, to apply, there must have been a substantial impairment of structural integrity prior to 2006. As the trial court explained in its memorandum of decision, and the plaintiff does not dispute, expert testimony is required to establish the existence of a substantial impairment of a building's structural integrity. The defendant noted in support of its motion for summary judgment that the plaintiff's expert, Grandpre, opined that, although the basement walls were "doomed" from inception due to the defective concrete, their structural integrity did not become substantially impaired until there was some outward manifestation of the walls' cracking and fracturing. The defendant further cited deposition testimony of the plaintiff, in which she testified that she first noticed cracking in the basement

concrete in 2006. This cracking, Grandpre testified, established the existence of a substantial impairment by *2006*. Moreover, the defendant asserted, in support of its summary judgment motion, that Grandpre never opined that it reasonably could be inferred from those cracks, or from any other evidence in the record, that the walls were substantially impaired *prior* to 2006. By advancing the foregoing evidence in support of its motion for summary judgment, the defendant met its burden of demonstrating the nonexistence of any material fact in the record with respect to the earliest date—sometime in 2006—on which the structural integrity of the basement walls was substantially impaired.

The plaintiff nonetheless argues that she presented sufficient evidence to rebut the evidence on which the defendant relied, thereby establishing a factual issue as to when the substantial impairment occurred. In particular, she refers to her observation of the crack in her bedroom wall in the late 1990s and the fact that nails had popped out of her kitchen walls sometime between 2005 and 2006. The plaintiff contends that, when those occurrences are considered together with the 2006 observation of the cracks in the basement walls, they are sufficient to raise a genuine issue of material fact as to whether the structural integrity of the basement walls was substantially impaired prior to 2006. As the trial court explained in rejecting this argument, however, Grandpre did not testify that the crack in the bedroom wall or the dislodged nails were in any way connected to the cracks in the basement walls. In the absence of any such testimony connecting the two events, the trial court could resort only to impermissible guesswork or speculation as to the existence of any such nexus. See, e.g., *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 34, 734 A.2d 85 (1999) ("[d]rawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence [is] oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable they must rest [on] some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess" (internal quotation marks omitted)). Moreover, as the trial court further explained, during the hearing on the defendant's motion for summary judgment, the court expressly invited the plaintiff to present additional evidence with respect to this issue, such as a supplemental affidavit by Grandpre attesting to the fact that a substantial impairment of structural integrity existed prior to 2006, but no such additional evidence was forthcoming. Because, as we have explained, the plaintiff previously had adduced insufficient evidence from which a fact finder reasonably could find that the structural integrity of the basement walls was substantially impaired before the plaintiff first observed cracks in the walls in 2006, her failure

to accept the trial court's invitation to provide such evidence is fatal to her claim that the impairment occurred prior to 2006. We thus conclude that the trial court correctly determined that the plaintiff failed to provide a factual basis for her claim that the structural integrity of her basement walls suffered from a substantial impairment prior to 2006.

We turn, therefore, to the plaintiff's challenge to the trial court's determination that the definition of "collapse" contained in the policies issued after March, 2005, unambiguously excludes coverage for the deterioration of her basement walls. The following well established principles guide our analysis of this claim. "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38, 84 A.3d 1167 (2014).

In light of these principles, it is apparent that the plaintiff's claim is barred by the definition of "collapse" contained in the policy because the plaintiff's home has not suffered "an abrupt falling down or caving in of a building or any part of a building" such that it "cannot be occupied for its current intended purpose." To the contrary, the plaintiff's home is still standing, the plaintiff continues to reside there, and, according to her own expert, she can continue to do so safely for the foreseeable future. Moreover, according to the plain-

tiff's deposition testimony, she continues to use her basement as she always has, namely, for recreational and storage purposes. We also agree with the trial court that, even if the plaintiff's basement walls were in imminent danger of falling down, which they indisputably are not, her claim would be barred by the provision of the policy clarifying when a collapse has *not* occurred, that is, when the building "shows evidence of cracking, bulging, sagging, bending, leaning, [settling], shrinkage or expansion" but is still "standing . . . ."

Clearly, as the trial court noted, the definition of collapse contained in the policy was crafted in response to numerous cases; see *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 252 (citing cases); decided in the latter half of the twentieth century, which held that, when the word "collapse" is not defined in a homeowners insurance policy, it should be interpreted to mean a substantial impairment of structural integrity rather than a catastrophic falling down or caving in. In adopting the substantial impairment standard in *Beach*, we stated that, if the insurer in that case had wished to avoid liability, it easily could have done so simply by defining "collapse" in terms that connoted the catastrophic event it claimed to have intended in that case. Id., 251 ("[i]f the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy [that is, one that denotes a complete falling down or caving in of the home], it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended"). The defendant in the present case has succeeded where the insurer in *Beach* failed: the policies the defendant issued to the plaintiff after March, 2005, define "collapse" in terms that leave no doubt that coverage for a collapse is triggered only by an abrupt falling down or caving in of the insured premises.

In concluding that the collapse provisions of the plaintiff's policy unambiguously exclude coverage under the circumstances presented, we join those other jurisdictions that have addressed the issue. To our knowledge, every single court that has interpreted the policy language at issue in the present case—or language that similarly defines the word "collapse" in terms that require temporal abruptness—has concluded that a building that is still standing, even if it is in danger of falling down, has not suffered a collapse within the meaning of the policy. See, e.g., *Valls* v. *Allstate Ins. Co.*, 919 F.3d 739, 746 (2d Cir. 2019) ("the 'collapse' provision in the Allstate [homeowners] insurance policy at issue . . . does not afford coverage for basement walls that exhibit signs of deterioration but that have not collapsed suddenly, accidentally, and entirely, as required by the [p]olicy"); *Cockill* v. *Nationwide Property & Casualty Ins. Co.*, Docket No. 3:18cv254 (MPS), 2018 WL 6182422, *2 (D. Conn. November 27, 2018) (construing allegations of complaint in light most favor-

able to insured and concluding they "do not allege an 'abrupt' or 'sudden' collapse," but, "[r]ather, the [plaintiffs] point to a 'chemical reaction in the concrete' that 'substantially impairs the structural integrity of the building.'"); *Enderle* v. *Amica Mutual Ins. Co.*, Docket No. 3:17cv1510 (WWE), 2018 WL 2048364, *3 (D. Conn. May 2, 2018) ("[the] [c]ourt has held that coverage was not applicable to a progressive condition causing deterioration [when] the house remained upright and inhabitable"); *Zamichiei* v. *CSAA Fire & Casualty Ins. Co.*, Docket No. 3:16-cv-739 (VAB), 2018 WL 950116, *7 (D. Conn. February 20, 2018) ("[t]he [p]olicy at issue requires 'an abrupt falling down or caving in,' and [the] [c]ourt sees no reason to depart from the analyses in [other] cases . . . finding that a sudden loss must occur abruptly, not gradually over time"); *Makufka* v. *CSAA Fire & Casualty Ins. Co.*, 304 F. Supp. 3d 275, 280 (D. Conn. 2018) ("There is no question of fact that the [p]remises [are] still standing and lived in by [the] [p]laintiffs and [have] not abruptly fallen down or caved in. Accordingly, the [p]olicy does not cover [the] [p]laintiffs' loss."); *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, 287 F. Supp. 3d 153, 157, 159 (D. Conn. 2017) (plaintiffs' claim for loss incurred by virtue of cracks in basement wall was barred by "express exclusions in the [p]olicy," which defined "collapse" as "an abrupt falling down or caving in," and provided that building is not in state of collapse if it is still standing, even if it shows signs of cracking); *Alexander* v. *General Ins. Co. of America*, Docket No. 3:16-cv-59 (SRU), 2017 WL 188134, *2 (D. Conn. January 17, 2017) ("[The] [p]laintiffs cannot avoid the fact that their basement walls are still standing. The only allegations of impairment to the structural integrity of the walls are allegations that the walls are 'cracking' or . . . they are 'bulging.' Both conditions are expressly excluded under the definition of the policy, and it is clear that no collapse has occurred."); *Markland* v. *Homesite Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-16-6010323-S (March 6, 2018) (no coverage under collapse provision of policy when plaintiffs continued to occupy home and there was no abrupt collapse but, rather, gradual deterioration of basement walls); *Perracchio* v. *Homesite Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-16-6010324-S (March 6, 2018) (66 Conn. L. Rptr. 240, 244–45) (same); *Toomey* v. *Central Mutual Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-15-6009841-S (August 3, 2017) (65 Conn. L. Rptr. 37, 42) ("The plaintiffs' home is still standing and habitable. The walls of the home have not fallen or caved in, and the deterioration of the walls is occurring over time [and] not abruptly. . . . Although the plaintiffs' expert opines that the condition of the basement walls will continue to worsen and [the walls will] eventually fall or cave in, they have not yet done so, and he could not say with any specificity as to when that could occur.") *Squairs* v. *Safeco National*

*Ins. Co.*, 136 App. Div. 3d 1393, 1394, 25 N.Y.S.3d 502 ("[T]he record established that [the] plaintiffs' home was standing when they submitted their claim . . . and there had been no 'abrupt falling down or caving in.' Thus, based on the unambiguous language of the policy, there was no 'collapse' of [the] plaintiffs' home"), appeal denied, 27 N.Y.3d 907, 56 N.E.3d 900, 36 N.Y.S.3d 620 (2016).

In support of her claim of coverage, the plaintiff relies on three cases with materially different facts from those of the present case: in each such case, the building in question had suffered a genuine or actual collapse that had rendered it (or a portion thereof) unsafe or uninhabitable. See *Scorpio* v. *Underwriters at Lloyd's, London*, Docket No. 10-325 (ML), 2012 WL 2020168, *1 (D.R.I. June 5, 2012) (building was declared uninhabitable after "the central portion of the roof . . . collapsed and [was] being held up by the interior walls that [were] not capable of supporting the roof" (internal quotation marks omitted)); *Landmark Realty, Inc.* v. *Great American Ins. Co.*, Docket No. JKS 10–278, 2010 WL 5055805, *1, *6 (D. Md. December 3, 2010) (building was condemned after floor dropped more than seventeen inches due to rotting floor support joists); *Malbco Holdings, LLC* v. *Amco Ins. Co.*, 629 F. Supp. 2d 1185, 1191 (D. Or. 2009) (hotel was declared unsafe for occupancy after ceiling had fallen several inches due to deterioration of floor truss system, and emergency shoring was required to prevent further collapse). The insureds in these cases all satisfied the first part of the "collapse" definition—that is, an abrupt falling down or caving in had occurred such that the building or a part thereof could not be occupied for its intended purpose—and so the only contested issue was whether coverage was nevertheless precluded because, to varying degrees, the buildings were still standing. In each of the cases, the court sided with the insured, concluding, as one court explained, that the provision as a whole was ambiguous as to "how far a building must fall down or to what degree a building must cave in to constitute collapse." *Malbco Holdings, LLC* v. *Amco Ins. Co.*, supra, 1196. In two of the cases, the court also found an "internal inconsistency between one subsection . . . (which provided coverage for partial collapse causing the building to be unsuitable for its intended purpose) and [two other] subsections . . . (which excluded coverage . . . if the building was still standing)"; *Scorpio* v. *Underwriters at Llyod's London*, supra, *5; see *Landmark Realty, Inc.* v. *Great American Ins. Co.*, supra, *4–5; an inconsistency that created an ambiguity in the policy to be resolved in favor of the insured.

The plaintiff's reliance on these cases is misplaced because, as we previously have explained, "[c]ontext is . . . central to the way in which policy language is applied; the same language may be found both ambiguous and unambiguous as applied to different facts. . . .

Language in an insurance contract, therefore, must be construed in the circumstances of [a particular] case, and cannot be found to be ambiguous [or unambiguous] in the abstract. . . . In sum, the same policy provision may shift between clarity and ambiguity with changes in the event at hand . . . and one court's determination that [a] term . . . was unambiguous, in the specific context of the case that was before it, is not dispositive of whether the term is clear in the context of a wholly different matter." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn. 41–42. The plaintiff's home has not suffered an abrupt falling down or caving in—complete or partial—such that her home or part of it cannot be occupied as intended. Thus, the issue of how extensive an actual collapse must be before coverage is triggered is not before us, and, for the same reason, we also have no occasion to decide whether the policy's partial collapse provision is internally consistent with any other provision of the policy.

The plaintiff finally argues that, in determining whether a collapse has occurred in the present case, we should consider only the first clause of the "collapse" definition, which she maintains is the operative definition under the policy, with the remaining clauses merely illustrating when a collapse has not occurred. The plaintiff contends that the first clause, which requires "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose," is sufficiently ambiguous to cover the gradual deterioration of her basement walls if we interpret (1) the term "abrupt" to mean "unexpected," rather than "sudden," (2) the term "cave in" to mean "substantial impairment of . . . structural integrity," rather than an actual falling in or loss of form, and (3) the phrase "cannot be occupied for its current intended purpose" to mean "cannot be occupied for the purpose it was designed for," as in "[a] typical, single-family residence is not designed or expected to experience the type of expansion found in the basement walls of the plaintiff's home."

The plaintiff's arguments notwithstanding, there is no plausible construction of the phrase "abrupt falling down or caving in . . . with the result that the building . . . cannot be occupied for its current intended purpose" that reasonably encompasses a home, such as the plaintiff's, that is still standing and capable of being safely lived in for many years—if not decades—to come. We will not read words to introduce ambiguity when, considering the common, ordinary meaning of those words as applied to the particular factual context presented, it is apparent that the words are in no way unclear or uncertain. See, e.g., *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn.

38. Put differently, "words do not become ambiguous simply because lawyers or lay[persons] contend for different meanings." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 584, 573 A.2d 699 (1990). A provision in an insurance policy is ambiguous only when it is *reasonably* susceptible of more than one reading, and the policy provision at issue, as applied to the facts of this case, is simply not susceptible of the meaning the plaintiff would have us ascribe to it. See, e.g., *Hurlburt* v. *Massachusetts Homeland Ins. Co.*, 310 F. Supp. 3d 333, 342 (D. Conn. 2018) (interpreting virtually identical provision and concluding that there was no collapse when homeowners "[still] reside in their home and have not alleged that they cannot or do not use it for its 'current intended purpose' "); *Cyr* v. *CSAA Fire & Casualty Ins. Co.*, Docket No. 3:16cv85 (DJS), 2018 WL 7508689, *5 (D. Conn. January 29, 2018) ("The damage to the . . . basement walls is due to defective material in the concrete that is causing it to deteriorate over time. The basement walls will . . . eventually give way, causing the house to fall into the basement. However, this has not happened yet. . . . Thus, at this point in time, the . . . home and . . . basement walls are only in danger of falling down or caving in and [the] home remains standing. Under these circumstances, the [insured] cannot meet the abrupt falling down and caving in portion of the definition. . . . Furthermore, the . . . home can still be occupied for its intended current purposes, pursuant to the definition." (Internal quotation marks omitted.)).

We note, finally, that, even if we agreed with the plaintiff that the definition of collapse contained in the policy is ambiguous and, therefore, that *Beach*'s substantial impairment standard applies to her claim, we nevertheless would be compelled to affirm the trial court's judgment in light of our decision today in *Karas* v. *Liberty Ins. Corp.*, 335 Conn. 62,      A.3d      (2019), in which we addressed a certified question from the United States District Court for the District of Connecticut seeking guidance as to what constitutes a "substantial impairment of structural integrity" of a building for purposes of applying a homeowners insurance policy in which the word "collapse" is undefined or otherwise ambiguous. See id.,      ,      . We concluded that a substantial impairment of the structural integrity of a building means that the building is in imminent danger of falling down and therefore unsafe to occupy. See id.,      . Because it is undisputed that the plaintiff's home is in no such danger, her claim of coverage would fail even under the standard, adopted by this court in *Beach*, that she contends is applicable for purposes of her policy.[8]

The judgment is affirmed.

In this opinion the other justices concurred.

* November 12, 2019, the date that this decision was released as a slip

opinion, is the operative date for all substantive and procedural purposes.

[1] The plaintiff brought this action in her capacity as trustee of the Edith R. Jemiola Living Trust because she now owns her home as the beneficiary of that trust.

[2] The plaintiff originally purchased the home with her husband, but she has owned the home, either individually or as a beneficiary of a living trust, since 2001.

[3] According to a study commissioned by the state of Connecticut and conducted by the Department of Consumer Protection, the stone aggregate used in Mottes concrete between 1983 and 2010 contained significant amounts of pyrrhotite, a ferrous mineral that oxidizes in the presence of water and oxygen to form expansive secondary minerals that crack and destabilize the concrete, resulting in its premature deterioration. See Department of Consumer Protection, State of Connecticut, Report on Deteriorating Concrete in Residential Foundations (December 30, 2016), pp. 1, 7–9, available at http://crcog.org/wp-content/uploads/2016/12/report_on_deteriorating_concrete_in_residential_foundations.pdf (last visited November 6, 2019). The economic consequences stemming from the widespread use of this defective concrete have been nothing short of catastrophic for many thousands of affected homeowners.

[4] The plaintiff also alleged a breach of the covenant of good faith and fair dealing and violations of the Connecticut Unfair Insurance Practices Act, General Statutes § 38-815 et seq., and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The plaintiff can prevail on these claims, however, only if she can prevail on her breach of contract claim, which, as we explain more fully hereinafter, she cannot do. Accordingly, the trial court properly granted the defendant's motion for summary judgment as to all of the plaintiff's claims.

[5] The plaintiff also argues that, under our holding in *Beach*, the term "collapse," when undefined in a homeowners' policy, encompasses a substantial impairment of a home's structural integrity *without* the additional requirement of proof that the home is in imminent danger of falling down or caving in. We apply this interpretation of our holding in *Beach* for present purposes only, that is, to determine which of the several policies issued by the defendant to the plaintiff is applicable, because the plaintiff's claim of coverage under the "collapse" provisions of her policy is predicated on such an interpretation. As we explain hereinafter, however, the term "collapse" *does* require proof of an imminent falling down or caving in, a showing that the plaintiff cannot make.

[6] The plaintiff appealed to the Appellate Court, and this court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We also granted permission to the following groups to file amicus curiae briefs in this appeal: United Policyholders, in support of the plaintiff's position, and the American Insurance Association, the Property Casualty Insurers Association of America, and the National Association of Mutual Insurance Companies, in support of the defendant's position.

[7] Before discussing the merits of the plaintiff's contention that the defendant was not entitled to summary judgment, we briefly set forth the principles that govern our consideration of this issue. "Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Internal quotation marks omitted.) *Cefaratti* v. *Aranow*, 321 Conn. 637, 645, 138 A.3d 837 (2016). "Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue." (Emphasis omitted; internal quotation marks omitted.) *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 593–94, 113 A.3d 932 (2015). The nonmoving party, however, has no obligation to submit documents establishing the existence of a genuine issue of material fact until the moving party has met its burden of "showing that it is quite clear what the truth is, and that

excludes any real doubt as to the existence of any [such] issue of material fact." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co.* v. *Tully*, 322 Conn. 566, 573, 142 A.3d 1079 (2016).

[8] Although she did not raise the issue in the trial court, the plaintiff asks us to consider the argument of the amicus curiae, United Policyholders, that, pursuant to the reasonable expectations doctrine, the plaintiff's reasonable expectations of coverage for the cost to insure that her home does not "inevitably fall to the ground" should prevail over the plain and unambiguous terms of the policy. We have characterized the reasonable expectations doctrine as "an approach . . . [pursuant to which] judges divine the parties' reasonable expectations and then rewrite the contract accordingly . . . ." (Internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 465 n.25, 870 A.2d 1048 (2005). In *Hammer* v. *Lumberman's Mutual Casualty Co.*, supra, 214 Conn. 573, which also involved an insurance contract dispute, we expressly declined to adopt such an approach. See id., 591. Our reasons for doing so are no less applicable to the present case. Thus, as we stated in *Hammer*, "[a]doption of the . . . contention in . . . light of the . . . language of the [policy] . . . would render meaningless the words by which the parties expressed their bargain and read into the contract something [that] is not there. . . . When the language of the policy is clear and unambiguous, the court is bound to apply the natural and ordinary meaning of the words employed. . . . A court cannot rewrite the policy of insurance or read into the insurance contract that which is not there. . . . [T]he liability of the insurer is not to be extended beyond the express terms of the contract. . . . [T]he policy expresses the reasonable expectations of the parties. . . . We, therefore, cannot accept the [argument in favor of recognizing the insured's] reasonable expectations." (Citations omitted; internal quotation marks omitted.) Id.

———————————————