# STEVEN KARAS ET AL. *v.* LIBERTY INSURANCE CORPORATION
## (SC 20149)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiffs, whose home was insured by the defendant insurance company, sought to recover damages from the defendant in an action brought in the United District Court for the District of Connecticut. The plaintiffs alleged, inter alia, that the defendant had breached certain provisions of the applicable homeowners insurance policy by declining coverage for the purported collapse of their concrete basement walls. The foundation to the plaintiffs' home had been constructed with defective concrete, causing it to crack and deteriorate prematurely. Although the plaintiffs' basement walls did not actually collapse, they suffered from severe cracking, were bowing inward, and required wood shoring for reinforcement, without which the walls could become unsafe at some point in the future. The plaintiffs claimed that they were covered under the policy because the deterioration of the concrete in their basement walls constituted hidden decay that had so substantially impaired their structural integrity that they were in a state of collapse, as that term had been defined in *Beach* v. *Middlesex Mutual Assurance Co.* (205 Conn. 246), in which this court concluded that that the term "collapse" in a homeowners insurance policy, when otherwise undefined, is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of an insured's home. The defendant filed a motion for summary judgment, asserting, inter alia, that the plaintiffs' loss was excluded under the provisions of the policy that expressly precluded coverage for the collapse of a building subject to certain exceptions that were inapplicable and that, alternatively, the plaintiffs' claim fell within an express exclusion in the policy for loss caused by the collapse of the home's foundation, of which, according to the defendant, the

Karas *v.* Liberty Ins. Corp.

home's basement walls were a part. The District Court denied the defendant's motion as to the plaintiffs' breach of contract claim, and, thereafter, that court certified a question of law to this court concerning what constitutes substantial impairment of structural integrity for purposes of applying the collapse provision of the plaintiffs' homeowners' insurance policy. Subsequently, this court issued an order reformulating the certified question to include additional questions. *Held*:

1. The substantial impairment of structural integrity standard, as set forth in *Beach*, was applicable to the collapse provision of the plaintiffs' homeowners insurance policy: the plaintiffs' policy having failed to define the term "collapse" or to limit collapse coverage in words that unmistakably connoted an actual collapse, there was ambiguity pertaining to that term, and a policy's use of the term "collapse," when not clearly defined, is fairly susceptible of being interpreted as including settling or cracking that results in the substantial impairment of the home's structural integrity; moreover, although the collapse provision in the plaintiffs' policy purported to exclude settling and cracking from its purview, it did not express a clear intent to exclude coverage for a collapse that ensues from what initially begins as unexceptional settling or cracking and what later develops into a far more serious structural infirmity culminating in an actual or imminent collapse.

2. This court concluded that, to satisfy the substantial impairment of structural integrity standard, an insured whose home has not actually collapsed must present evidence demonstrating that the home nevertheless is in imminent danger of falling down or caving in, that is, in imminent danger of an actual collapse; such a conclusion was implicit in this court's holding in *Beach*, as the cases on which the court in *Beach* relied for the proposition that the term "collapse" could encompass something short of an actual collapse each involved buildings, or parts thereof, that, like the house in *Beach*, were in imminent danger of collapsing or that otherwise had been declared unsafe for their intended purposes; moreover, the substantial impairment standard is not satisfied merely by evidence that a building will eventually fall down, particularly when it is not in immediate danger of collapsing and it likely can be safely occupied for years, if not decades, into the future.

3. The coverage exclusion in the plaintiffs' homeowners insurance policy for the collapse of the "foundation" unambiguously includes the basement walls of the plaintiffs' home: basement walls invariably are considered part of a building's foundation in state and local building codes, laypersons with no special knowledge of building codes or the intricacies of home construction generally understand that the concrete basement walls of a home are part of its foundation, definitions of the term "foundation" in dictionaries circulating at or around the time the applicable homeowners insurance policy was issued by the defendant to the plaintiffs support the view that concrete basement walls, and not just the footings beneath them, comprise a home's foundation, and various governmental entities consistently have referred, in public pronounce-

Karas *v.* Liberty Ins. Corp.

ments concerning Connecticut's crumbling foundations problem, to the affected basement walls as crumbling foundations; moreover, this court, for more than one century, has used the term "foundation wall" when referring to the basement wall of a building, a reference to the term "foundation" in an exclusion in the plaintiffs' homeowners insurance policy led to the conclusion that that term must mean more than just a footing, and this court rejected the reasoning of those federal and state courts that have concluded that the term "foundation" reasonably may be understood to refer solely to the footings beneath the basement walls.

Argued December 18, 2018—officially released November 12, 2019*

*Procedural History*

Action to recover damages for, inter alia, breach of an insurance contract, and for other relief, brought to the United States District Court for the District of Connecticut, where the court, *Underhill, J.*, granted in part the defendant's motion for summary judgment; thereafter, the court, *Underhill, J.*, certified a question of law to this court concerning the application of Connecticut insurance law; subsequently, this court reformulated the certified question.

*Michael D. Parker*, pro hac vice, with whom was *Jeffrey R. Lindequist*, for the appellants (plaintiffs).

*Robert A. Kole*, pro hac vice, with whom was *Kieran W. Leary*, for the appellee (defendant).

*Paul R. Doyle* and *Kevin P. Walsh* filed a brief for Connecticut Senator Paul R. Doyle as amicus curiae.

*Wystan M. Ackerman* filed a brief for the American Insurance Association et al. as amici curiae.

*Thomas O. Farrish* filed a brief for the Insurance Association of Connecticut as amicus curiae.

*Ryan M. Suerth, Marilyn B. Fagelson, Proloy K. Das* and *Sarah Gruber* filed a brief for United Policyholders as amicus curiae.

* November 12, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Karas *v.* Liberty Ins. Corp.

*Opinion*

PALMER, J. In *Beach* v. *Middlesex Mutual Assurance Co.*, 205 Conn. 246, 532 A.2d 1297 (1987), this court determined that the term "collapse" in a homeowners insurance policy, when otherwise undefined, "is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity" of the insureds' home. Id., 252. In the present case, which comes to us on certification from the United States District Court for the District of Connecticut; see General Statutes § 51-199b (d);[1] we consider whether that definition pertains to the collapse provisions of the homeowners insurance policy issued by the defendant, Liberty Insurance Corporation, to the plaintiffs, Steven Karas and Gail Karas, who claim coverage for the cracking and crumbling of their concrete basement walls, and, if the definition set forth in *Beach* does apply, what degree of deterioration constitutes a "substantial impairment of the structural integrity" of those walls sufficient to trigger coverage. *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 252. We also consider whether, under Connecticut law, the coverage exclusion in the plaintiffs' policy for the collapse of the home's "foundation" unambiguously includes the basement walls of the home. We conclude, first, that the *Beach* standard applies to the plaintiffs' policy, second, that the "substantial impairment of structural integrity" standard requires proof that the home is in imminent danger of falling down, and, third, that the term "foundation" unambiguously encompasses the home's basement walls.[2]

[1] General Statutes § 51-199b (d) provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."

[2] Following our acceptance of the certified questions, we granted permission to the following groups and individual to file amicus curiae briefs in this appeal: The American Insurance Association, Property Casualty Insurers

Karas *v.* Liberty Ins. Corp.

The record certified by the District Court contains the following undisputed facts and procedural history. The plaintiffs, who purchased their home in the town of Vernon in 2010,[3] are among hundreds of homeowners in northeastern Connecticut whose foundations were constructed using defective concrete manufactured by J.J. Mottes Concrete Company (Mottes). According to a study commissioned by the state of Connecticut and conducted by the Department of Consumer Protection, the stone aggregate used in Mottes concrete between 1983 and 2010 contained significant amounts of pyrrhotite, a ferrous mineral that oxidizes in the presence of water and oxygen to form expansive secondary minerals that crack and destabilize the concrete, resulting in its premature deterioration. See Department of Consumer Protection, State of Connecticut, Report on Deteriorating Concrete in Residential Foundations (December 30, 2016) pp. 1, 7–9 (Report on Deteriorating Concrete in Residential Foundations), available at http://crcog.org/wp-content/uploads/2016/12/report_on_deteriorating_concrete_in_residential_foundations.pdf (last visited November 6, 2019).

In October, 2013, the plaintiffs discovered that their basement walls were cracking and crumbling in the manner typical of Mottes concrete. On November 15, 2013, they submitted a claim to the defendant, which it denied. Thereafter, the plaintiffs commenced an action in the United States District Court for the District of Connecticut, alleging that the defendant had breached the collapse provisions of the policy by declining to compensate them for the purported collapse of their basement walls. The plaintiffs also alleged a breach of the covenant of good faith and fair dealing and violations of the Connecticut Unfair Insurance

Association of America, and the Insurance Association of Connecticut, in support of the defendant's position, and Connecticut Senator Paul R. Doyle and United Policyholders in support of the plaintiffs' position.

[3] The plaintiffs' home was built in 1984.

335 Conn. 62 JULY, 2020 67

Karas *v.* Liberty Ins. Corp.

Practices Act (CUIPA), General Statutes § 38a-815 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

In support of their claims, the plaintiffs relied on the following provisions in their homeowners insurance policy: "SECTION I—PERILS INSURED AGAINST . . . We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss . . . [i]nvolving collapse, other than as provided in Additional Coverage 8 . . . ." Additional Coverage 8, in turn, provides in relevant part: "Collapse. We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following: a. [Certain perils identified elsewhere in the policy, including fire, lightning, windstorm, hail, explosion, riot, civil commotion and volcanic eruption]; b. [h]idden decay; c. [h]idden insect or vermin damage; d. [w]eight of contents, equipment, animals or people; e. [w]eight of rain which collects on a roof; or f. [u]se of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e., and f. unless the loss is a direct result of the collapse of a building. Collapse does not include settling, cracking, shrinking, bulging or expansion." According to the plaintiffs, they are entitled to payment under these policy provisions because the deterioration of the concrete within their basement walls constitutes hidden decay that has so substantially impaired the walls' structural integrity that they are in a state of collapse as we defined that term in *Beach*.

Karas *v.* Liberty Ins. Corp.

In connection with the present action, the plaintiffs retained the services of David Grandpre, a structural engineer who has been retained in more than sixty cases involving Mottes concrete. In his deposition, Grandpre testified that the plaintiffs' foundation had ''the most severe cracking problem'' of any of the Mottes foundations he had inspected and that the basement walls were bowing inward approximately two inches. Grandpre opined that the chemical reaction occurring within the concrete cannot be arrested and that the only remedy is to replace the basement walls. At Grandpre's recommendation, the plaintiffs installed wood shoring to reinforce the walls. Grandpre testified that, without the shoring, the home ''might become unsafe at some time in the near future.'' When pressed on when the basement walls might become unsafe, Grandpre responded that he did not think he could ''say within a reasonable degree of engineering certainty'' that the walls will fall down ''within the next 100 years,'' although he thought that it is likely that they will do so within that time frame ''based on the fact that portions of the wall are already crumbling and falling to the floor . . . .''

The defendant filed a motion for summary judgment, asserting, inter alia, that the loss claimed by the plaintiffs is excluded under the provisions of the policy that expressly preclude coverage for the collapse of a building unless it results from one of several specified causes, none of which, the defendant argued, was applicable to the plaintiffs' claim. The defendant further argued that the plaintiffs' reliance on our definition of the term ''collapse'' in *Beach* was misplaced because the collapse provisions of their policy and the parallel provisions of the policy at issue in *Beach*, although similar, are sufficiently different to render *Beach* inapplicable to the present case. The defendant also maintained that, under *Beach*, a policyholder cannot establish a substantial impairment of a building's structural integrity with-

Karas *v.* Liberty Ins. Corp.

out proof that the building is in imminent danger of falling down, and, because the basement walls of the plaintiffs' home are in no such danger, the plaintiffs cannot prevail on their claim, even if the *Beach* standard is applicable. Finally, the defendant asserted that the plaintiffs' claim fell within an express exclusion in the policy for loss caused by collapse of the home's foundation because, according to the defendant, it cannot reasonably be disputed that a home's basement walls are part of the foundation.

The District Court denied the defendant's motion for summary judgment as to the plaintiffs' breach of contract claim but granted it as to the plaintiffs' remaining claims.[4] Thereafter, the defendant requested that the District Court seek this court's guidance by way of certification with respect to the following three questions:

"1. Is 'substantial impairment of structural integrity' the applicable standard for 'collapse' under the [plaintiffs' homeowners insurance policy] provision at issue?

"2. If the answer to question one is yes, then what constitutes 'substantial impairment of structural integrity' for purposes of applying the 'collapse' provision of [the plaintiffs' homeowners] insurance policy?

"3. Under Connecticut law, [does] the [term] 'foundation' . . . in a [homeowners] insurance policy unambiguously include basement walls? If not, and if [that term is] ambiguous, should extrinsic evidence as to the

---

[4] The District Court granted the defendant's motion with respect to the plaintiffs' claims alleging breach of the covenant of good faith and fair dealing and violations of CUIPA and CUTPA, concluding, inter alia, that there was no evidence that the defendant had denied the plaintiffs' claim in bad faith or otherwise demonstrated a pattern of not attempting in good faith to promptly and fairly settle claims in which the defendant's liability was reasonably clear.

meaning of 'foundation' . . . be considered?''[5] *Karas* v. *Liberty Ins. Corp.*, Docket No. 3:13-cv-01836 (SRU), 2018 WL 2002480, *4 (D. Conn. April 30, 2018).

The District Court granted the defendant's certification request only as to the second question; id., *5; concluding that guidance as to the meaning of "substantial impairment of structural integrity" was warranted because "[n]o Connecticut appellate decision has squarely applied *Beach* and arrived at a definition of 'substantial impairment of structural integrity' ''; id., *3; and because the issue of insurance claims arising from crumbling basement walls—an extremely distressing and costly problem that is estimated to have affected as many as 34,000 homes[6]—is "plainly of great importance to the [s]tate . . . and implicates broad questions of Connecticut public policy." (Citations omitted; internal quotation marks omitted.) Id., *3 and n.4. The District Court, however, declined to certify the first and third questions, concluding, with respect to the first question, that, because the collapse provisions of the policy in the present case do not define the term "collapse" and otherwise are virtually identical to the relevant provisions of the policy at issue in *Beach*, the substantial impairment standard applies to the policy in this case no less than it applied to the policy in *Beach*. Id., *4 and n.5. As to the third question, the District Court determined that certification was unnecessary

---

[5] We note that, in its proposed third certified question, the defendant requested that the District Court also seek guidance from this court as to whether the term "retaining wall," which, like the term "foundation," is excluded from coverage under the policy, unambiguously includes basement walls. In light of our conclusion that the damage to the basement walls of the plaintiffs' home unambiguously falls within the coverage exclusion for damage to the foundation; see part III of this opinion; we need not decide, and do not decide, whether the same would be true under the coverage exclusion for damage to a retaining wall.

[6] See L. Foderaro & K. Hussey, "Financial Relief Eludes Connecticut Homeowners with Crumbling Foundations," N.Y. Times, November 15, 2016, p. A24.

Karas *v.* Liberty Ins. Corp.

because Connecticut federal and state trial courts uniformly have rejected insurers' claims that the term "foundation" unambiguously includes basement walls; id., *4; those courts have concluded, rather, that the term also reasonably can be understood to refer solely to the concrete footing on which the basement walls rest but does not include the walls themselves.[7]

Following the District Court's order certifying the second question only, the defendant, as authorized by Practice Book § 82-4, filed an objection to that certification order. In particular, the defendant requested that this court answer, in addition to the question certified by the District Court, the two questions that the District Court had declined to certify. In support of this request, the defendant asserted, with respect to the first question, that the District Court incorrectly concluded that the collapse provision in the plaintiffs' policy is materially identical to the collapse provision at issue in *Beach*. With respect to the third question, the defendant maintained that the District Court's reliance on Connecticut Superior Court and United States District Court cases in declining to certify that question was misplaced because those cases were wrongly decided and are contrary to the weight of authority from other jurisdictions holding that a building's foundation includes its basement walls. The defendant also argued that, because no Connecticut appellate decision has addressed the issue of whether the term "foundation" in a homeowners insurance policy unambiguously encompasses base-

---

[7] See, e.g., *Clark* v. *Amica Mutual Ins. Co.*, Docket No. 3:16cv1573 (JBA), 2018 WL 2725441, *3–4 (D. Conn. June 6, 2018); *Roberts* v. *Liberty Mutual Fire Ins. Co.*, 264 F. Supp. 3d 394, 412–13 (D. Conn. 2017); *Metsack* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-CV-01150 (VLB), 2015 WL 5797016, *6 (D. Conn. September 30, 2015); *Gabriel* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-CV-01435-VAB, 2015 WL 5684063, *3–4 (D. Conn. September 28, 2015); *Karas* v. *Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 115 (D. Conn. 2014); *Roy* v. *Liberty Mutual Fire Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-15-6009410-S (February 22, 2017).

Karas *v.* Liberty Ins. Corp.

ment walls, the defendant "and likely other insurers . . . will not abandon their argument [that it does]" such that "a definitive resolution of the issue [by the Connecticut Supreme Court] that would apply across all cases" would have the salutary effect of saving the parties in those future cases considerable time and resources that otherwise would be spent litigating that issue.

In light of the significant number of cases in which any one or more of the three questions are likely to arise, we deem it prudent to grant the defendant's request and, accordingly, to issue an order reformulating the District Court's certified question to include the remaining two questions.[8] Additional facts and procedural history will be set forth as necessary.

I

We begin with the issue of whether we should apply *Beach*'s substantial impairment standard to the collapse provision of the plaintiffs' homeowners insurance policy. In support of its claim that we should not, the defendant contends that the plaintiffs' policy defines the term "collapse" with sufficient clarity and, therefore, that the *Beach* standard, which pertains only to policies that do not contain such a definition of the

---

[8] Under both General Statutes § 51-199b (f) (3) and Practice Book § 82-4, the order issued by a court certifying a question of law to this court must state that this court may reformulate any question that is certified, and, in accordance with those provisions, the certification order issued by the District Court in the present case contained such a statement. See *Karas* v. *Liberty Ins. Corp.*, supra, 2018 WL 2002480, *5. In addition, both § 51-199b (k) and Practice Book § 82-4 expressly authorize this court to reformulate any question certified to it.

We also note that, as originally certified, the third question would have required us to determine whether the basement walls of the plaintiffs' home fall unambiguously within the meaning of the term "retaining wall" as well as within the meaning of the term "foundation." For the reason previously set forth in footnote 5 of this opinion, we have reformulated the third certified question by limiting it to the issue of whether the home's basement walls are a part of the foundation.

Karas *v.* Liberty Ins. Corp.

term, is not applicable. The defendant further maintains
that, under this court's reasoning in *Beach*, the collapse
language used in the plaintiffs' policy operates to limit
collapse coverage to a catastrophic event characterized
by a sudden and complete falling in of a structure, an
event that concededly has not occurred in the present
case.

Before considering the applicability of *Beach* to the
present circumstances, we first set forth certain well
established principles applicable to the interpretation
of a policy of insurance. "An insurance policy is to be
interpreted by the same general rules that govern the
construction of any written contract . . . . In accor-
dance with those principles, [t]he determinative ques-
tion is the intent of the parties, that is, what coverage
the . . . [insured] expected to receive and what the
[insurer] was to provide, as disclosed by the provisions
of the policy. . . . If the terms of the policy are clear
and unambiguous, then the language, from which the
intention of the parties is to be deduced, must be
accorded its natural and ordinary meaning. . . . Under
those circumstances, the policy is to be given effect
according to its terms. . . . When interpreting [an
insurance policy], we must look at the contract as a
whole, consider all relevant portions together and, if
possible, give operative effect to every provision in
order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance
policy are clear and unambiguous, [a] court will not
torture words to import ambiguity [when] the ordinary
meaning leaves no room for ambiguity . . . . Similarly,
any ambiguity in a contract must emanate from the
language used in the contract rather than from one
party's subjective perception of the terms. . . . As with
contracts generally, a provision in an insurance policy
is ambiguous when it is reasonably susceptible to more
than one reading. . . . Under those circumstances, any
ambiguity in the terms of an insurance policy must be

Karas *v.* Liberty Ins. Corp.

construed in favor of the insured because the insurance company drafted the policy.'' (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38, 84 A.3d 1167 (2014). Finally, in construing an insurance contract, ''[c]ontext is often central to the way in which policy language is applied; the same language may be found both ambiguous and unambiguous as applied to different facts. . . . Language in an insurance contract, therefore, must be construed in the circumstances of [a particular] case, and cannot be found to be ambiguous [or unambiguous] in the abstract.'' (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 41–42. Mindful of these guiding principles, we turn to our decision in *Beach*.

The issue in that case was whether a house that was still standing but ''in imminent danger of falling over'' due to cracks in the foundation; (internal quotation marks omitted) *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 249; could be deemed to be in a state of collapse for purposes of applying a homeowners insurance policy that excluded losses resulting from ''settling, cracking, shrinkage, bulging or expansion'' of, among other things, pavement, foundations, walls and floors, ''unless . . . collapse of a building . . . not otherwise excluded ensues,'' in which case the loss resulting from the collapse was covered. (Internal quotation marks omitted.) Id., 250. The plaintiffs, Carter L. Beach and Mary Lawton Beach, brought an action against their insurer, the defendant Middlesex Mutual Assurance Company (Middlesex), after Middlesex denied their claim for the alleged collapse of their house. Id., 247. At trial, which was conducted before a trial referee, the evidence established that the Beaches had discovered a crack in one of their basement walls and notified Middlesex of the problem. Id. Middlesex sent a claims adjuster to their house to inspect the damage, and, while conducting the inspection, the adjuster

Karas *v.* Liberty Ins. Corp.

noticed that the house had actually separated from the top of the foundation. Id. Nevertheless, Middlesex denied the Beaches' claim on the ground that the damage to their foundation was the result of settling, which the insurance policy expressly excluded. Id., 248.

The crack continued to widen and, within three months, grew to a width of approximately nine inches. Id. As we explained, the trial referee further found that the "wooden support beams on top of the foundation wall had pulled apart and the concrete floor of the patio adjacent to the north side of the house had cracked and fallen in. Concerned over this deteriorating state of affairs, Carter Beach requested a site visit by [Middlesex'] engineer . . . but was told that coverage would still be denied because no 'collapse' of his home had occurred." Id. Thereafter, the Beaches hired a contractor to make all necessary repairs to their home; by then, "the foundation wall had tipped over into the basement from the top and was no longer supporting the house." Id. "Because the house never actually caved in [however], the [Beaches] continued in occupancy during the period in which [the contractor] undertook the needed structural repairs. Despite the nonoccurrence of a sudden catastrophe, the trial referee heard and found credible the testimony of a number of witnesses that the house would have caved in had the plaintiffs not acted to repair the damage. The trial referee expressly found that, '[g]iven the state of the structure, eventually the house would have fallen into the cellar.' The referee concluded that 'the foundation in the [Beaches'] house cracked . . . that the foundation failed structurally, and that the function of the foundation, both as a support structure for the house and a retaining wall, had become materially impaired, constituting collapse.' " Id., 248–49.

The trial court accepted the report of the trial referee, adopted the trial referee's recommendations, and ren-

dered judgment in accordance with the report. See id., 249. In doing so, the trial court explained that it had found the trial referee's report " 'to be sound, comprehensive and logical both factually and legally, including the [trial referee's] recommendations . . . [1] that a "collapse" in the sense of a material impairment of the basic structure of a building was included within the coverage of the insurance policy involved in [the] action . . . and [2] that the structure in question was in imminent danger of falling over . . . .' " Id.

On appeal to this court, Middlesex claimed that the trial court had incorrectly determined that a "collapse" is anything other than a catastrophic event involving a sudden and complete falling down or caving in of a building. See id., 250. Specifically, Middlesex argued that "the standard dictionary definition of 'collapse' on its face unambiguously connotes a sudden and complete catastrophe"; id.; characterized by a "falling in" or "loss of shape . . . ." Id., 252. Because the Beaches' house was indisputably still standing, Middlesex maintained that the house reasonably could not be deemed to have collapsed for purposes of triggering the policy's collapse provision. See id., 250–51. We disagreed, rejecting Middlesex' contention that the standard dictionary definition of "collapse" supported only one meaning, namely, a sudden and complete falling down or caving in. Id. We concluded that, "[a]lthough 'collapse' encompasses a catastrophic breakdown, as [Middlesex] argue[d]"; id., 251; it also includes, according to Webster's Third New International Dictionary, "a breakdown in vital energy, strength, or stamina . . . ." (Internal quotation marks omitted.) Id., 250. Accordingly, and in light of the principle that ambiguous language in an insurance contract is afforded the meaning most favorable to the insured; id.; we upheld the trial court's determination that Middlesex was liable to the Beaches under the policy. Id., 253.

Karas *v.* Liberty Ins. Corp.

In reaching our determination, we also rejected Middlesex' assertion that its interpretation was "the only one consistent with the terms of the clause excluding liability for loss by 'settling, cracking, shrinking, bulging or expansion.' " Id., 251. Specifically, Middlesex argued that this exclusionary clause must be read to "modify and inform the meaning of 'collapse' and necessarily narrow the purview of 'collapse' to [a] casualty of a sudden and cataclysmic nature." Id. Although we agreed that Middlesex' interpretation was "a plausible one"; id.; we concluded that there was another, equally plausible reading, namely, that the policy "exclude[s] loss related to 'settling, cracking, shrinkage, bulging or expansion,' only [as] long as 'collapse' does not ensue. Nowhere does the policy express a clear, unambiguous intent to exclude coverage for a catastrophe that subsequently develops out of a loss that appeared, at its inception, to fall within the rubric of 'settling, cracking, shrinkage, bulging or expansion.' On the contrary, the disputed policy provision covers a loss for 'collapse' [that], not otherwise being excluded, 'ensues.' To 'ensue' means 'to follow as a chance, likely, or necessary consequence . . . . [Webster's] Third New International Dictionary [(1961) p. 756]. By its reference to a 'collapse' that 'ensues,' the policy . . . can reasonably be understood to have contemplated coverage for a 'collapse' that follows consequentially from excluded activity. Read in its entirety, therefore, the defendant's policy does not unambiguously limit its liability to a 'collapse' of a sudden and catastrophic nature." *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 251–52. We further observed that, "[a]lthough the judicial decisions elsewhere are divided, the more persuasive authorities hold that the term 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building. . . . The cases to the contrary, which hold that 'collapse' unmistakably

Karas *v.* Liberty Ins. Corp.

connotes a sudden falling in, loss of shape, or flattening into a mass of rubble, have come to be in the distinct minority.'' (Citations omitted.) Id., 252.

The defendant in the present case asserts that the language of the plaintiffs' homeowners insurance policy is materially different from the language at issue in *Beach* because the plaintiffs' policy makes clear that a sudden falling or caving in is required to trigger collapse coverage. More specifically, the defendant argues that ''[t]he key difference is that the [policy at issue in] *Beach* . . . provide[d] that an excluded cause of loss (cracking) could potentially progress to the point where it becomes an 'ensu[ing]' covered 'collapse,' while the [policy in the present case] makes clear that a loss consisting of 'settling, cracking, shrinking, bulging or expansion' is *not* a collapse under any circumstances.'' (Emphasis in original.) Although the language of the collapse provisions of the plaintiffs' policy is somewhat different from that of the collapse provisions in the Beaches' policy, we disagree that this difference is sufficient to remove the ambiguity identified in *Beach* pertaining to the term ''collapse.'' As we previously explained, the plaintiffs' policy provides in relevant part: ''We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following . . . . Collapse does not include settling, cracking, shrinking, bulging or expansion.'' As in *Beach*, the term ''collapse'' is not further defined in the plaintiff's policy, and, although the collapse provision purports to exclude settling, cracking, shrinking, bulging and expansion from its purview, it does not express a clear intent to exclude coverage for a collapse that ensues from what initially began as unexceptional, run-of-the-mill settling, cracking, shrinking, bulging or expansion but what later developed into a far more serious structural infirmity culminating in an actual or imminent collapse. We therefore agree with those courts that have

Karas *v.* Liberty Ins. Corp.

concluded that a policy's use of the term "collapse," when not clearly defined, is "fairly susceptible to being interpreted as not including *mere* settling or cracking, but including settling or cracking that results in substantial impairment of a home's structural integrity . . . ." (Emphasis in original; internal quotation marks omitted.) *American Concept Ins. Co.* v. *Jones*, 935 F. Supp. 1220, 1227 (D. Utah 1996); see id. ("[i]t appears that the clear modern trend is to hold that collapse coverage provisions . . . [that] define collapse as not including cracking and settling . . . provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building"); see also, e.g., *Agosti* v. *Merrimack Mutual Fire Ins. Co.*, 279 F. Supp. 3d 370, 376 (D. Conn. 2017) ("the term collapse standing alone, is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building" (internal quotation marks omitted)); *Schray* v. *Fireman's Fund Ins. Co.*, 402 F. Supp. 2d 1212, 1218 (D. Or. 2005) ("the modern trend [is to] apply the collapse coverage if any part of the building sustained substantial impairment to its structural integrity").

Indeed, if the defendant had wished to limit its collapse coverage to a sudden and catastrophic event, it very easily could have done so in plain and unambiguous terms. As one court aptly observed in addressing this issue, "[t]he controversy surrounding the definition of 'collapse' began prior to 1960. See *Government Employees* [*Ins.*] *Co.* v. *DeJames*, 256 Md. 717, [723–24, 261 A.2d 747] (1970) (citing cases [decided] as early as 1958). Particularly with this much warning, the insurer is capable of unambiguously limiting collapse coverage [to a building reduced to a flattened form or rubble, namely, an actual collapse] if it wishes to do so. See *Rosen* v. *State Farm General* [*Ins.*] *Co.*, 30 Cal. 4th 1070, [1073, 1076, 70 P.3d 351, 135 Cal. Rptr. 2d 361] (2003) (no coverage for imminent collapse of deck when policy

Karas *v.* Liberty Ins. Corp.

provided '[w]e insure only for direct physical loss to covered property involving the sudden, entire collapse of a building or any part of a building . . . [and that] [c]ollapse means *actually fallen down or fallen into pieces.*') . . . .'' (Emphasis in original.) *Schray* v. *Fireman's Fund Ins. Co.*, supra, 402 F. Supp. 2d 1218; see also *Liston-Smith* v. *CSAA Fire & Casualty Ins. Co.*, 287 F. Supp. 3d 153, 157, 159 (D. Conn. 2017) (additional coverage for collapse did not cover cracks in foundation under homeowners insurance policy that defined "collapse" as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose"). Because the plaintiffs' policy does not limit collapse coverage in words that unmistakably connote an actual collapse, whereby a building is reduced to a flattened form or rubble, we agree with the plaintiffs that the substantial impairment standard applies to the present case.

The defendant nonetheless contends that we should interpret the plaintiffs' policy as requiring such a catastrophic event in light of our statement in *Beach* that, if the insurer in that case had "wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it . . . claims to have intended. See, e.g., *Nida* v. *State Farm Fire & Casualty Co.*, 454 So. 2d 328, 334 [(La. App.), cert. denied, 458 So. 2d 486 (La. 1984)].'' *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 251. The defendant argues that, because the collapse provision of the policy in *Nida* is identically worded to the collapse provision of the policy in the present case and this court cited *Nida* for the proposition that Middlesex could have expressly defined the term "collapse" to require a sudden and catastrophic event, we are obliged to conclude that the substantial impairment standard that we adopted in *Beach* does not apply in the present case.

Karas *v.* Liberty Ins. Corp.

Although concededly our reference to *Nida* in *Beach* was not a model of clarity, the defendant reads too much into our citation to that case. In referring to *Nida* in *Beach*, we intended only to underscore the point that insurers can define "collapse" in terms that would unambiguously exclude losses resulting from settling, cracking, shrinking, bulging or expansion, and the specific page to which we cited in *Nida* does no more than that. See *Nida* v. *State Farm Fire & Casualty Co.*, supra, 454 So. 2d 334 (explaining that language in question was "neither ambiguous nor unclear"). We were not required in *Beach* to decide, and did not purport to decide, whether we agreed with the court in *Nida* that the policy language at issue in that case unambiguously limited collapse coverage in the manner determined by that court. That question being squarely before us now, we conclude, for the foregoing reasons, that it does not.

II

Having determined that the substantial impairment of structural integrity standard applies to the plaintiffs' homeowners insurance policy, we now must clarify what constitutes such an impairment. Urging us to adopt a temporal requirement, the defendant argues that, if the term "collapse" is to have any real meaning, substantial impairment of structural integrity must denote that the building, though not yet in pieces on the ground, is in imminent danger of falling down. According to the defendant, collapse cannot mean "the [mere] gradual deterioration of a concrete foundation spanning not days, weeks, months or even years but decades, with no end (or actual 'collapse') in sight," because no one would construe the term "collapse" to describe such a state of affairs. In other words, the defendant insists, "[a] gradual process that may (or may not) result in a structure falling down at some indeterminate date decades from now is not a 'collapse' today . . . ." The defendant further observes that courts in other jurisdictions that have adopted the sub-

Karas *v.* Liberty Ins. Corp.

stantial impairment standard invariably require that the building be in imminent danger of falling down, thereby rendering it unsafe for occupancy, before collapse coverage is triggered. Finally, the defendant asserts that our decision in *Beach* quite clearly contemplates the necessity of an imminence requirement.

The plaintiffs, for their part, claim that such a requirement is not only unwarranted, but contrary to the reasoning of *Beach*. Although acknowledging that " '[t]he facts of *Beach* reflect the existence of an immediate danger of a complete falling in of the building," the plaintiffs, relying primarily on *Dino* v. *Safeco Ins. Co. of America*, Superior Court, judicial district of Tolland, Docket No. CV-16-6010428-S (June 28, 2018) (66 Conn. L. Rptr. 652), and *Roberts* v. *Liberty Mutual Fire Ins. Co.*, 264 F. Supp. 3d 394 (D. Conn. 2017), nevertheless contend that " 'the immediacy of that danger does not appear to drive the court's reasoning' " in *Beach*. The plaintiffs further assert that the imposition of an imminence requirement would place Connecticut homeowners in the untenable position of having "to wait until the house [is] about to fall in" before submitting a claim, even though their contractual and common-law duty to mitigate damages would be triggered as soon as they noticed cracks in their foundation, which, in cases involving Mottes concrete, typically happens years before the house is in any imminent or serious danger of falling down. In such circumstances, the plaintiffs argue, homeowners would "be denied coverage in every case of gradual, but inevitable, failure of the structure" of their home, which, they maintain, would render collapse coverage under their homeowners insurance policies "completely illusory." We agree with the defendant.

As the District Court observed in certifying this question, since our adoption of the substantial impairment standard in *Beach* thirty-two years ago, this court has had no occasion to apply or otherwise consider the standard in any other case. Most unfortunate, however,

Karas *v.* Liberty Ins. Corp.

due to the crisis involving crumbling basement walls that has confronted homeowners in Connecticut beginning in the early 2000s, both federal and state trial courts in Connecticut have been called on to do so numerous times. As several of those courts have observed, there is a split among them as to what constitutes a substantial impairment of structural integrity. Whereas some have held that the standard requires proof that ''a building would have caved in had the plaintiffs not acted to repair the damage''; (internal quotation marks omitted) *Roberts* v. *Liberty Mutual Fire Ins. Co.*, supra, 264 F. Supp. 3d 407; cf. *Dino* v. *Safeco Ins. Co. of America,* supra, 66 Conn. L. Rptr. 665–66; others have concluded that, if the plaintiff adduces the opinion of an expert that the structural integrity of a foundation is materially impaired, it is up to the jury, on the basis of that expert testimony, to decide whether that impairment is substantial enough to satisfy the standard. See, e.g., *Jang* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:15 CV 1243 (JBA), 2018 WL 3195148, *2 (D. Conn. February 22, 2018); see also *Metsack* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-CV-01150 (VLB), 2017 WL 706599, *6 (D. Conn. February 21, 2017) (plaintiffs presented evidence that cracks in basement walls comprised structural integrity of home, and, therefore, there was material dispute as to whether damage constituted collapse within meaning of homeowners insurance policy). Courts embracing the latter view read *Beach* as placing no particular definitional constraint on what constitutes a substantial impairment of a building's structural integrity, such that an impairment generally will be sufficient to meet the standard if a jury finds that it is.

Even those courts that have adopted the former view and require proof that a building would have caved in at some point in time if the homeowner had not undertaken the necessary repairs have not required a showing by the homeowner that the structure was in

Karas *v.* Liberty Ins. Corp.

imminent danger of falling down. See, e.g., *Roberts* v. *Liberty Mutual Fire Ins. Co.*, supra, 264 F. Supp. 3d 408 ("[*Beach*] indicated [that] it was sufficient that *eventually* the house would have fallen into the cellar" (emphasis in original; internal quotation marks omitted)). In declining to read *Beach* as imposing an imminence requirement, one court noted that the Beaches "continued in occupancy during . . . repairs" and that "the house never actually caved in"; (internal quotation marks omitted) id.; facts that, the court observed, supported the conclusion that a substantial impairment of a building's structural integrity need not be "so severe as to materially impair [the] building's ability to remain upright." (Internal quotation marks omitted.) Id. For courts that embrace this view, requiring proof that the building will eventually fall in, even if that event may be decades away, "achieves an appropriate middle ground that avoids either eviscerating catastrophic coverage of collapse . . . or effectively nullifying the faulty workmanship and settling exclusions." (Internal quotation marks omitted.) Id., 407. It also ensures that "[i]nsurers will not escape paying for catastrophic collapse[s] simply because insureds mitigate their losses by conducting emergency repairs, but, at the same time, they also will not . . . [become] liable for run-of-the-mill basement wall leakage and shifting problems." (Internal quotation marks omitted.) Id. We conclude that neither of these two views of the substantial impairment standard represents an accurate characterization of our holding in *Beach*.

As we explained, the issue we addressed in *Beach* was whether a house that was still standing but "in imminent danger of falling over"; *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 249; could nevertheless be deemed to be in a state of collapse for purposes of a homeowners insurance policy that excluded losses resulting from "settling, cracking, shrinkage, bulging or expan-

Karas *v.* Liberty Ins. Corp.

sion'' unless a ''collapse of a building . . . not otherwise excluded ensue[d] . . . .'' (Internal quotation marks omitted.) Id., 250. Because of the factual context in which the Beaches' claim of coverage was made, we had no reason to consider whether a building that was *not* in any imminent danger of falling over also could be found to be in a state of collapse under the same insurance policy. In light of the facts of *Beach*, and the cases we relied on in adopting the substantial impairment standard as an alternative to the catastrophic event standard advocated by Middlesex, we believe the answer to that question—that the building must be in imminent danger of falling down—was implicit in our holding in *Beach*.

As the defendant notes, the cases we cited in *Beach* for the proposition that the term ''collapse'' could encompass something short of a catastrophic event each involved buildings, or parts of buildings, that, like the house in *Beach*, were in imminent danger of falling over or otherwise had been declared unsafe for their intended purposes, in most cases both. See, e.g., *Auto Owners Ins. Co.* v. *Allen*, 362 So. 2d 176, 176–77 (Fla. App. 1978) (''[The homeowners' expert] stated that one exterior wall of the building had collapsed and a second was leaning out from the interior wall a significant distance. It was his opinion that the roof was kept from immediately falling only by resting on the interior walls and that the function of the wall and building . . . including the function of supporting the superstructure . . . was impaired and the total building . . . was in imminent danger of falling further.'' (Internal quotation marks omitted.)); *Nationwide Mutual Fire Ins. Co.* v. *Tomlin*, 181 Ga. App. 413, 414, 352 S.E.2d 612 (1986) (''[t]he exterior brick walls of the house have cracked and pulled away from the structure,'' requiring plaintiffs to install ''wood supports against the walls to prevent them from falling'' (internal quotation marks omitted)); *Rogers* v. *Maryland Casualty Co.*, 252 Iowa 1096, 1099, 109 N.W.2d 435 (1961) (''Of course [the] walls had not

Karas *v.* Liberty Ins. Corp.

completely fallen down. [But] [s]izable chunks of stucco had fallen from the foundation, and the entire north basement wall was in danger of falling in. The house was seriously damaged from cracks, bulging and buckling of the basement walls. The jury could find its basic structure was materially impaired and [that] it was dangerous to occupy it.''); *Government Employees Ins. Co.* v. *DeJames*, supra, 256 Md. 721 (''[w]hen asked to characterize the condition of the wall, [the expert witness stated that] it had failed, explaining that this was an engineering term meaning its condition was beyond any reasonable use, that it could no longer usefully sustain a load, that [i]t certainly was unsafe, that [i]t would not be safe if the wooden framework supporting the first floor joists and the shoring were removed'' (internal quotation marks omitted)); *Vormelker* v. *Oleksinski*, 40 Mich. App. 618, 622, 199 N.W.2d 287 (1972) (shifting foundation rendered home ''uninhabitable''); *Morton* v. *Travelers Indemnity Co.*, 171 Neb. 433, 439, 106 N.W.2d 710 (1960) (''[a consulting engineer] advised that the walls needed to be replaced or repaired by being braced or otherwise supported, because they could completely collapse in the foreseeable future''); *Morton* v. *Great American Ins. Co.*, 77 N.M. 35, 37, 419 P.2d 239 (1966) (''the failure and collapse of a part of [the] plaintiffs' house was of such an extent that its condition created an unsafe and dangerous situation with the possibility of further extensive damage to [the] dwelling'' (internal quotation marks omitted)); *Employers Mutual Casualty Co.* v. *Nelson*, 361 S.W.2d 704, 709 (Tex. 1962) (''[w]e think the term [collapse] can be defined properly as a sinking, bulging, breaking or pulling away of the foundation or walls or other supports so as materially to impair their function and to render the house unfit for habitation''); *Thornewell* v. *Indiana Lumbermens Mutual Ins. Co.*, 33 Wis. 2d 344, 349, 147 N.W.2d 317 (1967) (''[i]f the condition of the part of the building claimed to be in a state of collapse is such that the basic structure or

Karas *v.* Liberty Ins. Corp.

substantial integrity of the part is materially impaired so that it cannot perform its structural function as a part of the building and is in immediate danger of disintegrating, then it can be said to be in a state of collapse within the meaning of the extended coverage of the policy''). Like many of these courts, we concluded in *Beach* that ''[r]equiring the insured to await an actual collapse [before coverage is triggered] would not only be economically wasteful . . . but would also conflict with the insured's contractual and [common-law] duty to mitigate damages.'' (Citation omitted.) *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 253 n.2.

Cases that have been decided since *Beach*, with the exception of the crumbling basement wall cases in Connecticut, also require that a building be in imminent danger of falling down and therefore unsafe for its intended purpose. This requirement, as many of these courts have observed, ''avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage beyond the terms of the policy . . . .'' *Doheny West Homeowners' Assn.* v. *American Guarantee & Liability Ins. Co.*, 60 Cal. App. 4th 400, 406, 70 Cal. Rptr. 2d 260 (1997) (''since any of the excluded causes could result in collapse if the initial damage was neglected for a long enough period, an [imminence] limitation is logically necessary if we are to avoid converting this insurance policy into a maintenance agreement,'' and ''[t]his construction of the policy . . . is consistent with the policy language and the reasonable expectations of the insured''); see also *KAAPA Ethanol, LLC* v. *Affiliated FM Ins. Co.*, 660 F.3d 299, 306 (8th Cir. 2011) (imminence requirement ''comports with the reasonable expectations of the parties to the insurance contract . . . and achieves an appropriate middle ground that avoids eviscerating catastrophic coverage of collapse . . . or effectively nullifying the faulty workmanship and settling exclusions''); *Buczek* v. *Continental Casualty Ins.*

Karas *v.* Liberty Ins. Corp.

*Co.*, 378 F.3d 284, 290 (3d Cir. 2004) (defining "collapse" as substantial impairment of structural integrity that "connotes *imminent* collapse threatening the preservation of the building as a structure or . . . health and safety" (emphasis in original; internal quotation marks omitted)); *Whispering Creek Condominium Owner Assn.* v. *Alaska National Ins. Co.*, 774 P.2d 176, 179 (Alaska 1989) (substantial impairment standard was satisfied because building "was dangerous and in immediate danger of complete collapse"); *Doheny West Homeowners' Assn.* v. *American Guarantee & Liability Ins. Co.*, supra, 406 (jurisdictions that apply substantial impairment standard "do not extend coverage to impairment of structural integrity, even if the impairment is substantial, if it is unrelated to actual collapse," but, rather, "those [jurisdictions] either implicitly or explicitly require that collapse be imminent and inevitable, or all but inevitable"); *Doheny West Homeowners' Assn.* v. *American Guarantee & Liability Ins. Co.*, supra, 407 (observing that *Beach* itself was "decided on facts that indicate imminent danger and a degree of damage that indicates that the building will not stand"); *Fantis Foods, Inc.* v. *North River Ins. Co.*, 332 N.J. Super. 250, 260, 753 A.2d 176 (App. Div.) (if policy contains no definition of term "collapse," "such a policy must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and [passersby]"), cert. denied, 165 N.J. 677, 762 A.2d 658 (2000); *401 Fourth Street, Inc.* v. *Investors Ins. Group*, 583 Pa. 445, 460, 879 A.2d 166 (2005) ("imminent falling down of a building or part thereof" was required to trigger collapse coverage); *Ocean Winds Council of Co-Owners, Inc.* v. *Auto-Owner Ins. Co.*, 350 S.C. 268, 271, 565 S.E.2d 306 (2002) ("[w]e find a requirement of imminent collapse is the most reasonable construction of the policy clause covering risks of direct physical loss involving collapse" (internal quotation marks omitted)).

Karas *v.* Liberty Ins. Corp.

We agree with these well reasoned cases. We also agree with the following explication of the standard set forth by the Washington Supreme Court in *Queen Anne Park Homeowners Assn.* v. *State Farm Fire & Casualty Co.*, 183 Wn. 2d 485, 352 P.3d 790 (2015): "Of the definitions [of collapse] offered . . . substantial impairment of structural integrity is both reasonable and the most favorable to the insured. Based on the language of the [p]olicy, however, we caution that 'collapse' must mean something more than mere 'settling, cracking, shrinking, bulging or expansion.' . . . Also, we note that 'structural integrity' of a building means a building's ability to remain upright and 'substantial impairment' means a severe impairment. Taken together, 'substantial impairment' of 'structural integrity' means an impairment so severe as to materially impair a building's ability to remain upright. Considering the [p]olicy as a whole, [the court] conclude[s] that 'substantial impairment of structural integrity' means the substantial impairment of the structural integrity of all or part of a building that renders all or part of the building unfit for its function or unsafe and, in this case, means more than mere settling, cracking, shrinkage, bulging, or expansion." (Citation omitted; footnote omitted) Id., 491–92.

In our view, to conclude otherwise would not only nullify the exclusion contained in the plaintiffs' homeowners insurance policy for losses related to "settling, cracking, shrinkage, bulging or expansion," but would strip the term "collapse" of its natural and ordinary meaning. The plaintiffs' assertions to the contrary notwithstanding, an imminence requirement does not render collapse coverage under their policy illusory; it merely gives effect to the reasonable expectations of the parties as evidenced by the language of the policy. We therefore disagree with the plaintiffs that *Beach* supports the view that the substantial impairment standard may be satisfied merely by evidence that a building will

Karas *v.* Liberty Ins. Corp.

eventually fall down, even if it is in no present danger of doing so, and likely can be safely occupied for years, if not decades, into the future.

Relying primarily on *Roberts* v. *Liberty Mutual Fire Ins. Co.*, supra, 264 F. Supp. 3d 394, the plaintiffs nevertheless contend that an "eventual collapse" standard is appropriate because it accords with this court's statements in *Beach* that (1) the Beaches' house "eventually . . . would have fallen into the cellar"; (internal quotation marks omitted) *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 249; (2) the Beaches "continued in occupancy" while repairs were made; id., 248; and (3) the substantial impairment standard was satisfied "even though no actual [caving in had] occurred and the structure was not rendered completely uninhabitable." Id., 253.

We are not persuaded that any of these statements in *Beach* are incompatible or otherwise in tension with an imminence requirement. Our acknowledgment that the Beaches' house had not yet caved in but ultimately would do so was a statement of fact intended merely to underscore that an actual collapse was not necessary to trigger coverage under the standard we adopted. Likewise, our statement that the Beaches remained in their home while repairs were made contains no suggestion that it was safe for them to do so or, more generally, that a building that is *not* in any imminent danger of falling down and therefore poses *no* immediate threat to its occupants could nevertheless satisfy the substantial impairment standard. Indeed, we sometimes take calculated risks with respect to our personal safety, and the fact that we do so does not render those risks prudent or any less perilous. It bears emphasis, moreover, that the trial referee credited testimony in *Beach* that "the foundation wall had tipped over into the basement from the top *and was no longer supporting the house*." (Emphasis added.) Id., 248. In view of this and other findings concerning the urgent nature of the problem,

Karas *v.* Liberty Ins. Corp.

including the trial court's express determination that the house was in "imminent danger of falling over"; id., 249; it cannot reasonably be argued either that there was no immediate risk of the house's falling down or that the house posed no threat to the physical safety of those who resided there, even if they chose to remain in the house while it was being repaired.

We therefore conclude that, to meet the substantial impairment standard, an insured whose home has not actually collapsed must present evidence demonstrating that the home nevertheless is in imminent danger of such a collapse. Of course, whether this evidence satisfies the standard in any particular case necessarily will depend on the specific facts of the case and the strength and credibility of the expert testimony adduced by the insured and the insurer.

III

Finally, we turn to the issue of whether the coverage exclusion in the policy for the collapse of the home's "foundation" unambiguously includes the basement walls of the home. In support of their contention that it does not, the plaintiffs primarily rely on the decisions of the United States District Court for the District of Connecticut and state trial courts, which uniformly have rejected insurers' claims that the foundation of a home clearly includes the home's basement walls; rather, those courts have concluded that the term reasonably can be interpreted to refer solely to the footings beneath the basement walls. In contending that those cases were wrongly decided, the defendant identifies what it claims are significant flaws in the reasoning of the decisions and emphasizes, first, that neither this court nor the Appellate Court has ever endorsed the view that the term "foundation" properly can be understood to refer solely to the footings beneath the foundation's walls and, second, that virtually every independent source of the meaning of the term, including dictionaries, newspa-

Karas *v.* Liberty Ins. Corp.

per articles, statutes, and recent government reports addressing the state's so-called crumbling foundations crisis, categorically refute that view. The defendant also argues that the plaintiffs' homeowners insurance policy itself belies any such understanding of the meaning of the term "foundation" because the policy expressly distinguishes between a "footing" and a "foundation," thereby making clear that the two terms have different meanings. We conclude that the term "foundation" in the plaintiffs' policy unambiguously includes the home's basement walls.

We begin our analysis by noting that the plaintiffs do not dispute that basement walls are invariably considered part of a building's foundation in state and local building codes and among building professionals. Indeed, the plaintiffs' own expert, Grandpre, testified unequivocally on this point during his deposition. Grandpre also testified that the definition of "foundation" contained in the report of the Department of Consumer Protection on the crumbling foundations issue comports with his own understanding of that word. That report provides that "[a] foundation for a residential structure consists of three essential parts. The footing provides the base *which supports the foundation walls* and the slab forms the floor." (Emphasis added.) Report on Deteriorating Concrete in Residential Foundations, supra, p. 2 n.1. According to Grandpre, this definition is "the standard of the industry . . . ."

Of course, the fact that building professionals invariably understand that basement walls are part of a home's foundation is not dispositive of our inquiry because it is well settled that the terms of an insurance policy, unless otherwise clearly defined in the policy itself, must be construed as laypersons understand them. See, e.g., *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974 (2002); see also 2 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2010) § 22:38, p. 22-164 ("[t]he rule that words in insurance policies

Karas *v.* Liberty Ins. Corp.

are to be construed using their ordinary and popular meanings has long been recognized . . . and has been applied in the context of various types of insurance''). We are persuaded, however, that even laypersons with no special knowledge of building codes or the intricacies of home construction understand that the concrete basement walls of a home are part of its foundation.

Our conclusion finds support in the various dictionaries in circulation at or around the time the policy was issued to the plaintiffs. See, e.g., *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 539, 791 A.2d 489 (2002) (it is appropriate to look to dictionary definition of term to ascertain its commonly approved meaning). For example, Webster's Third New International Dictionary defines ''foundation'' in relevant part as ''the supporting part of a wall or structure usu[-ally] below ground level and *including footings* . . . the whole masonry substructure of a building . . . .'' (Emphasis added.) Webster's Third New International Dictionary (2002) p. 898. Consistent with this definition, it defines ''footing'' in relevant part as ''an enlargement *at the lower end of a foundation wall*, pier, or column to distribute the load . . . .'' (Emphasis added.) Id., p. 885. Merriam-Webster's Collegiate Dictionary similarly defines ''foundation'' in relevant part as ''*the whole masonry substructure of a building* . . . .'' (Emphasis added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 494. According to the Random House Unabridged Dictionary, a ''footing'' is ''the *part* of a foundation bearing directly upon the earth.'' (Emphasis added.) Random House Unabridged Dictionary (2d Ed. 1993) p. 746. These sources demonstrate that, although footings are certainly *part* of a home's foundation, they do not constitute the *entire* foundation, which is also comprised of the basement walls.[9]

---

[9] The plaintiffs call our attention to Webster's New World Dictionary of the American Language, which defines ''foundation'' as ''the base on which something rests; specif[ically], the supporting part of a wall, house, etc.,

Karas *v.* Liberty Ins. Corp.

The fact that concrete basement walls, and not just footings, comprise a home's foundation has also been confirmed repeatedly by the government entities tasked with addressing Connecticut's crumbling foundations problem, including the legislature, the Office of the Attorney General, the Department of Insurance and, as previously noted, the Department of Consumer Protection. In all of their public pronouncements addressing the issue, these entities have unfailingly referred to the affected basement walls as crumbling foundations. See, e.g., General Statutes § 8-441 (establishing "Crumbling Foundations Assistance Fund"); General Statutes § 8-442 (establishing "Collapsing Foundations Credit Enhancements Program"); General Statutes § 8-443 (a) (authorizing municipal joint borrowing "from any source for the purpose of paying for all or part of the cost of any project entered into jointly to abate a deleterious condition on real property that, if left unabated, would cause the collapse of a concrete foundation due to the presence of pyrrhotite"); General Statutes § 8-445(authorizing issuance of bonding for purposes of "Crumbling Foundations Assistance Fund"); General Statutes § 20-327b (d) (4) (G) ("[p]rospective buyers may have a concrete foundation inspected by a licensed professional engineer . . . for deterioration of the foundation due to the presence of pyrrhotite"); Letter from Attorney General George Jepsen to Governor Dannel P. Malloy and Jonathan A. Harris, Commissioner of Consumer Protection (July 7, 2016) (concerning consumer protection inves-

[that is] usually of masonry, concrete, etc., and at least partially underground . . . ." Webster's New World Dictionary of the American Language (2d College Ed. 1972) p. 551. According to the plaintiffs, under this definition, because footings are the base on which basement walls rest, the term "foundation" reasonably may be understood to refer solely to the footings. We are not persuaded. The definition of "foundation" contained in Webster's New World Dictionary of the American Language is fully consistent with the definitions previously set forth because it defines a foundation as being "at least partially underground," and footings, by their very nature, are never "partially underground"; they are *entirely* underground, below the undersurface of the foundation walls and floor.

Karas *v.* Liberty Ins. Corp.

tigation of "[c]rumbling [c]oncrete [h]ome [f]ounda-tions"), available at https://portal.ct.gov/-/media/DCP/ pdf/ConcreteStatusreporttoGovandDCPJuly2016PDF .PDF?la=en (last visited November 6, 2019); Letter from Andrew N. Mais, Insurance Commissioner, to Insurers Writing Homeowners and Condominium Insurance in Connecticut (June 10, 2019) (2019 update to insurers concerning "foundations that are crumbling or other-wise deteriorating"), available at https://portal.ct.gov/-/ media/CID/2019CrumblingFoundationNotice.pdf (last visited November 6, 2019). Notably, other government publications are in accord with this understanding of what comprises a foundation. For example, a handbook on home construction issued by the United States Department of Agriculture provides that "[f]oundation walls form an enclosure for basements or crawl spaces and carry wall, floor, roof, and other building loads." U.S. Department of Agriculture, Agriculture Handbook No. 73: Wood-Frame House Construction (Rev. April, 1975) p. 8, available at https://naldc.nal.usda.gov/download/ CAT 87209853/PDF (last visited November 6, 2019). That handbook also provided that "*footings* act as the base of the foundation and transmit the superimposed load to the soil." (Emphasis in original.) Id., p. 5. Moreover, media reports addressing the crumbling foundations problem also consistently have referred to the affected basement walls as crumbling foundations. E.g., L. Foder-aro & K. Hussey, "Financial Relief Eludes Connecticut Homeowners with Crumbling Foundations," N.Y. Times, November 15, 2016, p. A24 (referring to "crumbling con-crete foundations"); S. Haigh, "Lawmakers Continue Push To Address Crumbling Foundations," U.S. News & World Report, March 8, 2019 (referring to Connecti-cut's "crumbling foundations prob-lem"), available at https://www.usnews.com/news/best-states/connecticut/ articles/2019-03-08/lawmakers-look-to-more-bills-to -address-crumbling-basements (last visited November 6, 2019).

Karas *v.* Liberty Ins. Corp.

Our conclusion finds further support in the fact that, for well over one century, this court has used the term "foundation wall" when referring to the basement wall of a building. *Beach* v. *Middlesex Mutual Assurance Co.*, supra, 205 Conn. 248 ("[t]he crack in the north foundation wall continued to widen, and by May of 1976 had reached a width of approximately nine inches"); see also *Menga* v. *Kabakoff*, 110 Conn. 381, 383, 148 A. 131 (1930) ("[t]here is no claim that the outside of the foundation walls above the ground was not stuccoed"); *O'Keefe* v. *Corp. of St. Francis's Church*, 59 Conn. 551, 556, 22 A. 325 (1890) ("the foundation walls were carried to a much greater depth than intended in the original plan or called for in the specifications and contract"); *Gear* v. *Barnum*, 37 Conn. 229, 231 (1870) ("[t]he foundation walls of a building are a part of the building itself"). The fact that we have done so, although not dispositive of the issue before us, fortifies the conclusion that, in common parlance, a "basement wall" and a "foundation wall" are one and the same.

Finally, the policy contains an exclusion for loss to a "foundation" and, by endorsement, loss to a "footing" caused by water or ice. If the term "foundation" means "footing," as the plaintiffs contend, then the "footing" endorsement is superfluous. "We previously have recognized the canon of construction of insurance policies that a policy should not be interpreted so as to render any part of it superfluous. . . . Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction . . . ." (Internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 468, 870 A.2d 1048 (2005). The redundancy that results from the plaintiffs' interpretation of the policy readily can be avoided by treating the terms "footing" and "foundation" as having different meanings, a result that, as we have explained, is also dictated by the dictionary definitions of those two terms.

Karas *v.* Liberty Ins. Corp.

The plaintiffs nonetheless urge us to follow the decisions of the United States District Court for the District of Connecticut and state trial courts that have addressed this issue, all of which have concluded that the term "foundation" reasonably may be understood to refer solely to the footings beneath the basement walls. Although we hold these courts in high regard, for the reasons that follow, we are not persuaded by the reasoning underlying their conclusion that the term "foundation" is ambiguous because it is reasonably susceptible of the meaning attributed to it by the plaintiffs, namely, that it includes only the footings and not the basement walls themselves.

The first case in which a Connecticut court found the term "foundation" to be ambiguous, which many courts later followed, was *Bacewicz* v. *NGM Ins. Co.*, Docket No. 3:08-CV-1530 (JCH), 2010 WL 3023882 (D. Conn. August 2, 2010). As in the present case, the named defendant in *Bacewicz*, NGM Insurance Company, argued that the plaintiffs, Joseph Bacewicz and Janice Bacewicz, could not recover for the alleged collapse of their basement walls because foundations were expressly excluded under the collapse provisions of their homeowners insurance policy. Id., *3. And like the plaintiffs in the present case, the Bacewiczes maintained that the term "foundation" reasonably could be understood as connoting only the footings beneath their basement walls. Id. Although acknowledging that "much of the evidence in [the] case indicates that the terms 'basement walls' and 'foundation walls' are used interchangeably"; id., *4; for two reasons, the District Court nevertheless sided with the Bacewiczes. See id.

First, the District Court found support for the interpretation advanced by the Bacewiczes in *Turner* v. *State Farm Fire & Casualty Cos.*, 614 So. 2d 1029 (Ala. 1993). See *Bacewicz* v. *NGM Ins. Co.*, supra, 2010 WL 3023882, *4 (citing *Turner* and noting that "at least one other court considering a similar question has held that

Karas *v.* Liberty Ins. Corp.

'a person of ordinary intelligence could reasonably conclude . . . that the term "foundation" refers only to [footings]' ''). In *Turner*, the plaintiffs, Gary Lee Turner and Linda C. Turner, purchased their home while it was still under construction. See *Turner* v. *State Farm Fire & Casualty Cos.*, supra, 1030. Before the house was completed, a basement wall collapsed; id.; and the Turners filed a claim under their builder's risk insurance policy, which the defendant insurer, State Farm Fire and Casualty Companies (State Farm), denied on the ground that the policy's collapse provision excluded foundations. See id., 1030–31. The Turners thereafter commenced an action against State Farm, which subsequently filed a motion for summary judgment, claiming that the Turners' basement walls were excluded from coverage under the unambiguous terms of the policy. See id. The trial court agreed with State Farm and granted its summary judgment motion. See id., 1030. On appeal to the Alabama Supreme Court, the Turners claimed "that the term 'foundation' [should] not encompass their basement walls because . . . the walls were free standing when constructed *and formed the interior walls of the first floor of the house*. [The Turners] filled dirt around the walls to make a basement sometime after their construction." (Emphasis added.) Id., 1031. Because the walls purportedly had formed the interior walls of the first floor of their home when they purchased it, the Turners maintained that "they understood the term 'foundation' to mean the [three by three footing] under the basement wall." Id. Solely on the basis of the Turners' testimony, the Alabama Supreme Court concluded that "a person of ordinary intelligence could reasonably conclude, as the Turners say they did, that the term 'foundation' refers only to the piece of concrete at the base of the wall . . . ."[10] Id., 1032.

---

[10] It bears noting that the only definitions of the term "foundation" to which the court in *Turner* referred were definitions that, as the court itself acknowledged, supported *State Farm's contention* that the term unambiguously encompasses basement walls. See *Turner* v. *State Farm Fire & Casualty Cos.*, supra, 614 So. 2d 1031–32.

Karas *v.* Liberty Ins. Corp.

We agree with the defendant that, contrary to the conclusion of the District Court in *Bacewicz*, *Turner* is not persuasive authority. To begin with, the facts of that case are readily distinguishable because there is no claim in the present case that the plaintiffs' basement walls ever formed the interior walls of the first floor of their home. Perhaps more fundamentally, the court in *Turner* engaged in no meaningful analysis of whether the term "foundation" is reasonably susceptible of a meaning that would exclude a home's basement walls but, rather, simply relied on the Turners' subjective understanding of that word, in contravention of the established principle that a party's subjective understanding of the language used in a contract, unless objectively reasonable, does not render the language ambiguous. See, e.g., *Yellow Book Sales & Distribution Co.* v. *Valle*, 311 Conn. 112, 119, 84 A.3d 1196 (2014) ("any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms" (internal quotation marks omitted)).

In concluding that the term "foundation" is ambiguous, the court in *Bacewicz* also relied on the deposition testimony of Grandpre, who, as in the present case, was retained by the homeowners and testified as an expert witness on their behalf. The District Court observed that Grandpre's testimony "appear[ed] to indicate that there are multiple definitions of the term 'foundation.' " *Bacewicz* v. *NGM Ins. Co.*, supra, 2010 WL 3023882, *4. Grandpre, however, provided no such testimony in the present case. To the contrary, he stated unequivocally that a foundation is comprised of three parts: the basement walls, the basement floor and the footings beneath the basement walls. *Bacewicz*, in our view, loses its persuasive force in light of the foregoing critique of *Turner* and the differing testimony of Grandpre.

Since *Bacewicz*, federal and state courts consistently have rejected insurers' claims that the term "founda-

Karas *v.* Liberty Ins. Corp.

tion'' unambiguously includes basement walls, concluding, instead, largely on the basis of *Bacewicz*—or cases that relied on *Bacewicz*—that the word is also reasonably understood to refer solely to the footings beneath a basement wall. See, e.g., *Clark* v. *Amica Mutual Ins. Co.*, Docket No. 3:16cv1573 (JBA), 2018 WL 2725441, *3 (D. Conn. June 6, 2018) (''[The] [d]efendant acknowledges that courts in this district have previously held that the term 'foundation' is ambiguous. . . . Those cases note that the term 'foundation' could also mean the 'footings' of a structure as a number of dictionaries define the term 'foundation' as 'the lowest [load bearing] part of the building.' . . . Indeed, in *Bacewicz*, the court specifically [concluded] . . . that 'a reasonable jury could find that the basement walls of the [plaintiffs'] house did not constitute the ''foundation'' of the house.' '' [Citations omitted.]); *Roberts* v. *Liberty Mutual Fire Ins. Co.*, supra, 264 F. Supp. 3d 412 (concluding that basement walls were not unambiguously part of foundation); *Metsack* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-CV-01150 (VLB), 2015 WL 5797016, *6 (D. Conn. September 30, 2015) (citing *Bacewicz* and noting that ''[p]rior courts have held that the term 'foundation' could refer to the 'footings' of a structure, citing an Alabama Supreme Court case [namely, *Turner*] which described the 'footings' as a '[three by three] foot piece of concrete under the basement wall' ''); *Gabriel* v. *Liberty Mutual Fire Ins. Co.*, Docket No. 3:14-CV-01435-VAB, 2015 WL 5684063, *3–4 (D. Conn. September 28, 2015) (citing *Bacewicz* and noting that United States District Court for the District of Connecticut ''has held several times in recent cases involving nearly identical facts and policy language that the [term] 'foundation' . . . [is] ambiguous . . . . The same conclusion is appropriate here. The term 'foundation' is ambiguous because it is reasonably susceptible to the [plaintiffs'] interpretation to mean footings under the basement walls . . . .'' [Citations omitted.]); *Belz*

Karas *v.* Liberty Ins. Corp.

v. *Peerless Ins. Co.*, 46 F. Supp. 3d 157, 163 (D. Conn. 2014) (citing *Bacewicz* and noting that United States District Court for District of Connecticut "has not only already held that the term 'foundation' is ambiguous, but it did so in a case involving similar basement wall cracking and identical policy language"); *Karas* v. *Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 115 (D. Conn. 2014) (citing *Bacewicz* for proposition that alternative "definition of 'foundation' could be the footing [on] which the basement walls rest, which does not include the basement walls"); *Dino* v. *Safeco Ins. Co. of America*, supra, 66 Conn. L. Rptr. 666 (citing *Bacewicz* and noting that "[e]very state and federal court decision in Connecticut considering this issue has concluded that 'foundation' . . . [is] ambiguous as applied to the basement walls of a house"); *Roy* v. *Liberty Mutual Fire Ins. Co.*, Superior Court, judicial district of Tolland, Docket No. CV-15-6009410-S (February 22, 2017) (citing *Bacewicz* for proposition that "the term 'foundation' is ambiguous because 'a person of ordinary intelligence could reasonably conclude . . . that the term "foundation" refers to the piece of concrete at the base of the wall, rather than a concrete basement wall itself' "). Ordinarily, the weight and unanimity of such authority would lead us to the same conclusion. As we have indicated, however, the holding of each of these cases inherited the same analytical infirmities found in *Bacewicz*.

Recently, several courts have provided two additional reasons for concluding that the term "foundation" is ambiguous as to whether it includes a home's basement walls, neither of which is persuasive. First, these courts have found support for their interpretation in the "replacement value calculation" provision of the policy at issue in the present case, which prescribes the method of calculating 80 percent of the replacement value of a covered building and provides in relevant part: "To determine the amount of insurance required to equal [80 percent] of the full replacement cost of the

Karas *v.* Liberty Ins. Corp.

building immediately before the loss, do not include the value of:

"(a) Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

"(b) Those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

"(c), Underground flues, pipes, wiring and drains."

Reading the qualifying phrase "which are below the undersurface of the lowest basement floor" as modifying *all* of the excluded items in that provision, the courts have explained that that provision supports the conclusion that a foundation can be located entirely below the undersurface of the lowest basement floor. See, e.g., *Metsack* v. *Liberty Mutual Fire Ins. Co.*, supra, 2015 WL 5797016, *7 ("implicit in the [replacement value] calculation [is the] key [concept] . . . that a foundation can exist 'below the undersurface of the lowest basement floor,' which implies that a basement wall and a foundation are not always one and the same" [emphasis omitted]); see also *Clark* v. *Amica Mutual Ins. Co.*, supra, 2018 WL 2725441, *4 ("the language in [the replacement value calculation provision] does not require that the term 'foundation' be interpreted as always including basement walls" [emphasis omitted]). When the provision is read in this manner, the definition of "foundation" necessarily excludes a home's basement walls because basement walls are always *above* the undersurface of the lowest basement floor.

As the defendant contends, however, this interpretation of the replacement value calculation provision runs afoul of the last antecedent rule, a principle of contract and statutory interpretation pursuant to which a limiting clause or phrase is read as modifying only the noun or phrase that immediately precedes it; e.g., *Corsair*

*Special Situations Fund, L.P.* v. *Engineered Framing Systems, Inc.*, 327 Conn. 467, 475, 174 A.3d 791 (2018); see also *Connecticut Ins. Guaranty Assn.* v. *Drown*, 314 Conn. 161, 190, 101 A.3d 200 (2014); unless the limiting language is separated from the preceding noun or phrase by a comma, in which case "one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately preceding it." *State* v. *Rodriguez-Roman*, 297 Conn. 66, 76, 3 A.3d 783 (2010). Because there is no comma separating the phrase "which are below the undersurface of the lowest basement floor" from the list of items excluded from the replacement value calculation, that phrase, in the absence of evidence of a contrary intention—and there is none in this case—is properly read as referring solely to the phrase "or any supports . . . ."

Although the last antecedent rule is not inviolate, its application in the present case makes perfect sense. We see no reason why the parties, in determining 80 percent of the replacement cost of a home, would exclude only a fraction of the cost of the excavation, foundation, and piers—namely, the cost corresponding to the portion of those items that lie "below the undersurface of the lowest basement floor . . . ." Application of the last antecedent rule, by contrast, yields an eminently reasonable construction of the replacement value calculation provision pursuant to which every item that is below the surface of the ground, including underground flues, pipes, wiring and drains, is excluded from the calculation, rather than merely a portion of some of those items.

Applying the canon of statutory construction known as noscitur a sociis, which in Latin means "it is known by its associates"; (internal quotation marks omitted) *State* v. *Agron*, 323 Conn. 629, 635 n.3, 148 A.3d 1052 (2016); at least two courts also have concluded that, because the other items excluded from coverage under the collapse provisions of the policy generally are

Karas *v.* Liberty Ins. Corp.

located outside of a home,[11] the foundation exclusion is ambiguous insofar as it is not clear whether the exclusion applies to the foundation beneath an insured's home or to some other foundation peripheral to the home. See, e.g., *Metsack* v. *Liberty Mutual Fire Ins. Co.*, supra, 2015 WL 5797016, *7 n.2 ("Given that the term 'foundation' is ambiguous, the [c]ourt notes that [the plaintiffs'] interpretation is potentially supported by the interpretative [principle] of noscitur a sociis . . . . With the exception of 'foundation,' all of the terms used in the exclusion reference ancillary structures to the building itself. A reasonable trier of fact could conclude that the other terms used in the exclusion shed light on the term 'foundation' and suggest that term to be a reference to a more ancillary structure than the wall of a basement room." [Citation omitted.]); *Roy* v. *Liberty Mutual Fire Ins. Co.*, supra, Superior Court, Docket No. CV-15-6009410-S ("[T]his section of the policy appears to exclude items that would be found outside of a building, and not inside a building, such as an awning, fence, patio, pavement, pool, [and] septic tank. This list of outside items suggests that what was intended by this exclusion language includes only items found outside of the home or at a minimum renders it ambiguous.").

The canon of noscitur a sociis, however, is applied to aid in the construction of a statute only when the statutory terms are ambiguous; see, e.g., *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 178, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*,     U.S.     , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019); and not "to create uncertainty in an otherwise unambiguous term . . . ." *Schenkel & Shultz, Inc.* v. *Homestead Ins. Co.*, 119 F.3d 548, 551 (7th Cir.1997). Because we conclude that the term

_____

[11] As we previously noted, those items are identified in the policy as "an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock . . . ."

"foundation'' unambiguously includes a home's basement walls, applying the canon in the present case is unwarranted. The use of the canon in the present case, moreover, also contravenes the canon of statutory and contract interpretation that, ordinarily, when the same words are used two or more times, they will be given the same meaning in each instance. See, e.g., *State* v. *Lutters*, 270 Conn. 198, 211, 853 A.2d 434 (2004); see also 4 W. Jaeger, Williston on the Law of Contracts (3d Ed. 1961) § 618, pp. 715–16 (it may be presumed that words used repeatedly in same contract have same meaning throughout contract). The plaintiffs do not dispute that the term "foundation'' appears throughout the policy, not just in the provision pertaining to collapse.[12] In the absence of evidence of a contrary intention, therefore, we presume that the parties intended the term to mean the same thing each time it is used, rather than one thing for purposes of applying the collapse provision and something entirely different for every other purpose. See, e.g., *Chesapeake Energy Corp.* v. *Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 116 (2d Cir. 2014) (rejecting contract interpretation that would "[cause] the term to mean different things in different instances of its appearance''). In considering the plaintiffs' argument, we are also mindful that, for the vast majority of single-family home owners, there is only one foundation covered by their homeowners insurance policy: the foundation located directly

---

[12] For example, "SECTION I—PERILS INSURED AGAINST'' provides in relevant part: "We do not insure . . . for loss . . . [c]aused by . . . [f]reezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a . . . [f]oundation . . . .'' That section further provides: "We do not insure . . . for loss . . . [c]aused by . . . [s]ettling, shrinking, bulging or expansion, including resulting cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings . . . .''

In addition, "SECTION I—EXCLUSIONS'' provides in relevant part: "We do not insure for loss caused directly or indirectly by . . . [w]ater below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.''

Karas *v.* Liberty Ins. Corp.

beneath the home, on which the home rests. We disagree, therefore, that a reasonable homeowner in the plaintiffs' position, upon reading the term "foundation" in his or her homeowners insurance policy, would believe that the reference did not pertain to the foundation attached to the house but, rather, to some other, likely nonexistent foundation.

Finally, we reject the plaintiffs' contention that the foundation exclusion should not be enforced as written because the policy expressly covers the "collapse of a building or any part of a building" and a foundation indisputably is part of a building. In the plaintiffs' view, excluding the foundation from coverage would render coverage under the policy illusory. As this court has explained, however, "[t]he reason for or purpose of an exclusion clause in a policy is to eliminate from coverage specified losses . . . [that] except for the exclusion clause would remain under the coverage. . . . [T]he word exclusion signifies . . . circumstances in which the insurance company will not assume liability for a specific risk or hazard *that otherwise would be included within the general scope of the policy.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 588–89, 573 A.2d 699 (1990). Unless the exclusionary language eliminates coverage altogether, it does not render the coverage illusory. See, e.g., *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 333 Conn. 343, 373–74, 216 A.3d 629 (2019) ("even a significant exclusion limiting available coverage does not mean that the insured did not get the coverage for which it bargained . . . or that the insurance policies . . . are rendered meaningless by virtue of the denial of coverage" [internal quotation marks omitted]); *Connecticut Ins. Guaranty Assn.* v. *Drown*, 134 Conn. App. 140, 153, 37 A.3d 820 (2012) (rejecting claim that coverage was illusory because, "[a]lthough [the] exclusion . . . place[d] limits on cov-

Karas *v.* Liberty Ins. Corp.

erage, [it did] not . . . [eviscerate] all coverage under the policy''), aff'd, 314 Conn. 161, 101 A.3d 200 (2014). Accordingly, the fact that the clause at issue limits the scope of the policy's coverage for "a building or part of a building'' by excluding part of the building (the foundation) does not render that coverage a nullity. As the defendant stated at oral argument, the policy offers unqualified coverage for the collapse of a building or part of a building that may result from any number of perils. There are even circumstances in which the foundation itself is covered, such as when the collapse is the result of wind, fire or an explosion, or if the foundation collapses as a result of the collapse of the building. Moreover, the defendant also acknowledges that, even when the collapse of a foundation is excluded from coverage because it resulted from hidden decay within the foundation itself, any damage to the rest of the building caused by that collapse would be covered.[13] See, e.g., *Campbell* v. *Norfolk & Dedham Mutual Fire Ins. Co.*, 682 A.2d 933, 936 (R.I. 1996) ("if the collapse of the basement's foundation was the cause of the building's complete destruction, the insured could collect for loss sustained to the upper portion of the dwelling but not for damage to the foundation because loss to the foundation was the direct result of the falling in of the foundation itself and not the direct result of the falling in of the entire building'' (internal quotation marks omitted)).

We acknowledge, as the plaintiffs note, that the Rhode Island Supreme Court reached a different con-

---

[13] As we previously noted, "Additional Coverage 8" of the policy provides in relevant part: "Collapse: We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused . . . by . . . b. [h]idden decay . . . . Loss to [a] . . . foundation . . . is not included under [item] b. . . . unless the loss is a direct result of the collapse of a building.'' Under the express terms of the policy, therefore, the collapse of a building or any part of a building, with the exception of the foundation, caused by hidden decay anywhere in the building, even in the foundation, is covered under the policy; loss to the foundation is excluded from coverage if it caused by hidden decay within the foundation itself.

Karas *v.* Liberty Ins. Corp.

clusion with respect to this issue in *Campbell*, a per curiam opinion in which the court determined that the foundation exclusion at issue ''render[ed] illusory as applied to the foundation the earlier policy provision purporting to insure against the risk of 'collapse of a building or any part of a building.' '' Id. The court in *Campbell* did not explain, however, why exempting the foundation from the provision granting coverage for the collapse of a building would render that coverage illusory, and we cannot perceive any justification for that conclusion in light of the fact that the policy at issue in that case, like the policy in the present case, covers many other losses due to the structure's collapse. Indeed, the decision of the Rhode Island Supreme Court in *Campbell* runs counter to that court's repeated holding, consistent with our own precedent and the case law of virtually every other state, that a policy provision offering coverage for a particular peril will not be deemed illusory unless it would not result in coverage under any reasonably expected set of circumstances. See, e.g., *Great American E & S Ins. Co.* v. *End Zone Pub & Grill of Narragansett, Inc.*, 45 A.3d 571, 576 (R.I. 2012) (''[w]e will deem an exclusion to an insurance policy illusory only when it would preclude coverage in almost any circumstance'' (internal quotation marks omitted)); see *Pressman* v. *Aetna Casualty & Surety Co.*, 574 A.2d 757, 759 (R.I. 1990) (it was against public policy to apply narrow definition to term in insurance policy because such application rendered coverage illusory); see also, e.g., *Bethel* v. *Darwin Select Ins. Co.*, 735 F.3d 1035, 1040, 1041 (8th Cir. 2013) (Minnesota law applies doctrine of illusory coverage to construe insurance contracts ''so as not to be a delusion to the insured'' and to avoid ''functionally nonexistent'' coverage (internal quotation marks omitted)); *Cynergy, LLC* v. *First American Title Ins. Co.*, 706 F.3d 1321, 1327 (11th Cir. 2013) (''under Georgia law, an insurance policy may not purport to offer coverage that inevitably

Karas *v.* Liberty Ins. Corp.

will be defeated by one of the policy's exclusions—in other words, the policy may not offer coverage that is chimerical''). In light of the foregoing, we conclude that the term ''foundation'' in the plaintiffs' homeowners insurance policy unambiguously includes the plaintiffs' basement walls and that the collapse provision in that policy applies to any foundation located on the plaintiffs' property, including the one beneath the plaintiffs' house.

IV

We, of course, recognize the seriousness of the crumbling foundations problem that confronts the plaintiffs in the present case, and we also acknowledge the gravity of the problem for so many other homeowners statewide. Our sole task, however, is to construe the plaintiffs' homeowners insurance policy as we would any other such contract, that is, in accordance with its terms as applied to the facts of the case. We have endeavored to do so here.

The answer to the first certified question is ''yes,'' that is, the ''substantial impairment of structural integrity'' standard is applicable to the ''collapse'' provision of the plaintiffs' homeowners insurance policy.

The answer to the second certified question is the ''substantial impairment of structural integrity'' standard requires a showing that the building is in imminent danger of falling down or caving in, that is, in imminent danger of an actual collapse.

The answer to the third certified question is ''yes,'' that is, the term ''foundation'' in the plaintiffs' homeowners insurance policy unambiguously includes the basement walls of the plaintiffs' home.

No costs shall be taxed in this court to any party.

In this opinion the other judges concurred.